CADY, Chief Justice.
*580 In this appeal, we must decide if substantial evidence was presented to establish that a juvenile committed a sex offense by force and whether the mandatory sex offender registry statute for certain juvenile sex offenders violates the prohibition against cruel and unusual punishment under either the Iowa or United States Constitution. The juvenile court found the juvenile committed a sex offense by force and ordered him to register as a sex offender. We transferred the appeal to the court of appeals. It found substantial evidence that the juvenile committed a sex offense by force and that the sex offender registry requirements imposed by law did not violate the prohibition against cruel and unusual punishment under either the Iowa or United States Constitution. On our further review from the court of appeals decision, we affirm the decision of the juvenile court and the decision of the court of appeals.
I. Factual Background and Proceedings.
On or about July 15, 2015, T.H., a fourteen-year-old boy, knocked on the door of I.N., a sixteen-year-old girl whom T.H. had known for a few years. I.N. answered the door, and T.H. told her he had a gift for her. He told I.N. he had ordered a ring and wanted to give it to her. I.N. asked her mother if she could talk with T.H. on the front porch, and her mother gave her permission. Once the two were outside, they talked for a few minutes, and T.H. began to kiss I.N., over her objections. T.H. then sat on the porch and asked I.N. to join him. She initially refused, but T.H. continued to insist.
I.N. sat down on the porch next to T.H., who then exposed his penis and shoved the back of I.N.'s head downward toward it. I.N. protested repeatedly, and as she said "no," T.H.'s penis entered her mouth. T.H. kept his hand on I.N.'s head so she could not raise her head. I.N. then bit T.H.'s penis in order to free herself, prompting T.H. to release her head. T.H. asked her why she had bit him, and I.N. responded that she did not want to do this and had said no. I.N. slapped T.H. in the face, and T.H. went home.
I.N. ran inside and told her mother what had happened. I.N.'s mother called the police. I.N. was interviewed by the police and a few days later interviewed by the Child Advocacy Center. The police also interviewed T.H. Although T.H. initially denied the incident, after an officer falsely represented to him that there was surveillance footage of the encounter, T.H. admitted to forcing I.N. to perform oral sex and that she bit him in the process. After the police interview, without an officer in the room, T.H. wrote an apology letter to I.N. He wrote,
Dear [I.N.],
I sorry for forcing you to suck my penis. I'm so sorry. If you forgive me, I'll be happy. So just remember I still care about you.
Love, [T.H.]
Since the incident, I.N. has experienced recurring nightmares about the incident and is wary around boys who resemble T.H. She also has had difficulty participating in school when the topic of sexual abuse is discussed.
On July 21, 2015, the State filed a delinquency petition alleging the delinquency of T.H. based on a number of incidents. The State alleged T.H. committed sexual abuse *581 in the third degree by performing a sex act by force or against the will of I.N. in violation of Iowa Code section 709.4(1)(a ) (2016). Based on domestic incidents that occurred in late June 2015, the State also alleged two counts of simple assault for punching and choking his mother, one count of simple assault for punching his brother, and one count of criminal mischief in the fifth degree for throwing a mop through a window of his residence.
The juvenile court held an adjudicatory hearing during which I.N. testified about the incident, as well as the detective who conducted the investigation. Following the witnesses' testimonies, the juvenile court dismissed the four counts relating to the domestic incidents. On December 11, the juvenile court adjudicated T.H. delinquent for performing a sex act by force and against the will of I.N. in violation of Iowa Code section 709.4(1)(a ). The court, therefore, found that T.H. had committed sexual abuse in the third degree and that his offense was committed with force.
The court soon thereafter issued its dispositional order, which discussed T.H.'s mental health history, past behavioral problems, and prior rehabilitation efforts by the State. T.H.'s father has never played a role in his life, and his mother has been married three times. Her second husband was an alcoholic, and her third husband abused her, sometimes in T.H.'s presence. After the third husband left the home, T.H. kept in contact with him, as he provided drugs to T.H. and his friends. Currently, the man who is living in T.H.'s home is a multistate offender with prior arrests for narcotics possession, domestic violence, and child endangerment. T.H.'s mother has a history of substance abuse, although she has been sober for over seven years. She currently works the overnight shift at Wal-Mart. From 2004 to 2008, T.H. lived with his maternal grandmother and stepgrandfather in Texas, and they have since continued to request custody of T.H.
Prior to the incident with I.N., T.H. had received a number of services to address his mental health and behavioral needs. In August 2011, T.H. was removed from his home by the police and taken to St. Luke's Hospital for aggressive behavior. In September 2011, he was placed in the Four Oaks PMIC Program and resided in the facility for seven months. In December 2012, T.H. was committed to the Cherokee Mental Health Institute (MHI) after threatening to stab kids at school with a paper knife, drawing pictures of shooting people and blowing up houses, and stating that voices in his head were telling him to do bad things. He remained at Cherokee MHI until February 2013, when he received a placement at the Boys and Girls Home in Sioux City. Through each of the out-of-home placements, T.H. was given services relating to anger management, coping mechanisms, age-appropriate social skills, communication skills, and self-esteem. T.H. was returned to his parental home in August 2013 with a good prognosis.
Beginning in January 2014, the Sioux City police were frequently called to assist with family disturbances in his home. T.H.'s mother struggled to contain T.H.'s behavior and sought assistance from juvenile officers and a therapist. In September 2014, after T.H. broke a window in the family home, he was placed on an Informal Adjustment and assigned twenty hours of community service. T.H.'s mother also pursued outpatient mental health services and medication for T.H. School liaison services were also added to support him at school. In June of 2015, police were twice called to address incidents within his home after T.H. punched his brother and mother and placed his mother in a choke hold during an argument. Juvenile officers discussed *582 the possibility of a second Informal Adjustment, but opted to give T.H. one month to demonstrate his ability to live in the home without aggression. Less than a month later, T.H. was brought to detention for sexually abusing I.N.
After being placed in detention, T.H. completed two psychological evaluations. T.H. was diagnosed with a schizoaffective disorder, bipolar type; an attention deficit/hyperactivity disorder, combined presentation; an oppositional defiant disorder, moderate; and an unspecified anxiety disorder. T.H. expressed a desire not to be returned to his parental home, stating he was afraid he would hurt his mother, brother, or do something sexual again.
Considering the above circumstances and T.H.'s history of prior services, the court concluded that it was in T.H.'s best interests to be placed in a residential treatment facility. The court ordered T.H. to be placed in the S.T.O.P. program at the Four Oaks facility where he would receive a number of services. The court also found that T.H.'s offense is a tier III sexual offense, and therefore, T.H. was required to register as a sex offender pursuant to Iowa Code section 692A.102(1)(c )(10). The court explained it had no discretion to defer or waive the sex offender registration requirements, as T.H. was fourteen years old and committed his offense with force. Accordingly, the court ordered T.H. to register as a sex offender pursuant to Iowa Code section 692A.103(4).
T.H. appealed and raised two issues. First, he asserted there was insufficient evidence to find he committed sexual abuse by force. Second, he argued the mandatory sex offender registration constituted cruel and unusual punishment in violation of both the Iowa and United States Constitutions. We transferred the case to the court of appeals. It concluded there was substantial evidence to support a finding that T.H. sexually abused I.N. by force. It also found that mandatory sex offender registration for juveniles was not cruel and unusual punishment.
We granted T.H.'s application for further review.
II. Standard of Review.
Juvenile delinquency proceedings are "special proceedings that provide an alternative to the criminal prosecution of children where the best interest of the child is the objective." In re M.L. , 868 N.W.2d 456, 460 (Iowa Ct. App. 2015). We consider the sufficiency of the evidence in juvenile delinquency adjudications de novo. In re D.S. , 856 N.W.2d 348, 351 (Iowa 2014). We review constitutional challenges de novo. State v. Roby , 897 N.W.2d 127, 137 (Iowa 2017).
III. Analysis.
A. Sufficiency of Evidence. A person commits sexual abuse in the third degree when the person performs a sex act under various circumstances, including when "[t]he act is done by force or against the will of the other person." Iowa Code § 709.4(1)(a ). T.H. alleges the State introduced insufficient evidence that he committed a sex act "by force or against the will" of I.N.
The essence of the claim asserted by T.H. is built upon two propositions. First, he used the nature of their relationship to support the absence of any evidence of force. T.H. asserted he had been pursuing a relationship with I.N., they maintained a friendly relationship, they had spent time together alone in the past, I.N. never felt threatened or fearful during any past encounter, and he was invited by I.N. into her home to be alone with her at the time in question. Second, he claimed the testimony of I.N. about the event was both *583 implausible and inconsistent, claiming the sex act that occurred was voluntary.
Upon our review of the transcript, we find substantial evidence to support the crime, including the element of force. I.N. testified T.H. forced her head into his erect penis, and she responded by repeatedly telling him "no." T.H. acknowledged to police that he forced I.N.'s head down into his penis and that he asked her why she did not want to perform oral sex. Upon our de novo review, we also consider the findings of the juvenile judge who heard the testimony and evaluated the credibility of the witnesses. In re A.K. , 825 N.W.2d 46, 49 (Iowa 2013).
B. Mandatory Juvenile Sex Offender Registration. T.H. next argues that the mandatory sex offender registration requirement constitutes cruel and unusual punishment because the governing statute does not permit the juvenile court to waive the registration requirement for juveniles like himself who were found delinquent of a sex act under aggravated circumstances. He argues the constitutional protections entitle all juveniles to an individualized assessment by the juvenile court to determine if registration should be waived or imposed. T.H. builds his argument on those cases requiring an individualized hearing before sentencing juvenile offenders to imprisonment without parole. See generally State v. Lyle , 854 N.W.2d 378 (Iowa 2014) ; State v. Ragland , 836 N.W.2d 107 (Iowa 2013) ; State v. Pearson , 836 N.W.2d 88 (Iowa 2013) ; State v. Null , 836 N.W.2d 41 (Iowa 2013).
To address this argument, we must first determine the operation of the sex offender registry statute with respect to juvenile offenders. This task requires us to consider two statutory schemes: the sex offender registry statute and the statute governing the adjudication and disposition of juvenile offenders. Second, we will review the requirements of the sex offender registry statute as applied to T.H.
1. Mandatory registration for certain juveniles. The Iowa Sex Offender Registry statute broadly governs the registration of sex offenders in Iowa. Under the statute, any person "convicted" of an offense designated as a tier I, II, or III crime is required to register with the Iowa Sex Offender Registry. Iowa Code § 692A.103(1). Generally, this registration requirement applies to juvenile offenders. Juveniles adjudicated delinquent of a qualifying offense are considered "convicted" for registration purposes. Id. § 692A.101(7).
Notwithstanding, the registration statute permits the juvenile court to "waive[ ] the registration" for juvenile offenders if it "finds that the person should not be required to register." Id. § 692A.103(3). Additionally, if a juvenile court does not initially waive the registration requirement, it may subsequently "modify or suspend the registration requirements" upon a showing of good cause prior to the discharge of a juvenile from the jurisdiction of the court. Id. § 692A.103(5).
Yet, the statute does not permit the juvenile court to waive the registration requirements, or modify or suspend the requirements, for juveniles fourteen years of age or older at the time of their sex offense and who committed their offense "by force or the threat of serious violence, by rendering the victim unconscious, or by involuntary drugging of the victim." Id. § 692A.103(4). If a juvenile commits a sex offense under these circumstances, the juvenile must register as a sex offender and may not petition the juvenile court to modify or suspend the registration requirements prior to the discharge from the jurisdiction of the court. Id. § 692A.103(5)(e ). Accordingly, under the sex offender registration statute, juveniles *584 who are found delinquent of an aggravated sex offense must register as sex offenders, and the requirement cannot be waived under the statute by the juvenile court.
The provisions of the sex offender registration statute, however, must be read in conjunction with the juvenile justice provisions of chapter 232. In particular, the statute governing dispositional orders for juvenile offenders directs the juvenile court to "determine whether [a] child shall remain on the sex offender registry prior to termination of the dispositional order." Id. § 232.54(1)(i ). Importantly, unlike the provisions governing the waiver of the registration requirement for juveniles, the authority of the juvenile court to determine if a juvenile should remain on the registry after the dispositional order terminates does not exclude juveniles who commit sex crimes under aggravated circumstances. Thus, an aggravated sex offender must initially register under the statute. However, any time a court acts to terminate a child's dispositional order that "require[d] [the] child to register as a sex offender pursuant to chapter 692A, the juvenile court shall determine whether the child shall remain on the sex offender registry prior to the termination of the dispositional order."[1] Id.
This approach is not only consistent with the language of chapter 692A and chapter 232, but it is also in line with the objective of the juvenile law. Retaining the juvenile court's jurisdiction is consistent with the research that shows juvenile sex offenders can achieve rehabilitation far easier than adult sex offenders. See Robert E. Shepherd Jr., Advocating for the Juvenile Sex Offender, Part 1 , 21 Crim. Just. 53, 54 (2006) ("Adolescent sex offenders are far less predatory, are less likely to engage in serious or aggressive behaviors, are far more amenable to successful treatment, are more readily treated and supervised within the community, and have significantly lower recidivism rates."); see also Roper v. Simmons , 543 U.S. 551, 569-71, 125 S.Ct. 1183, 1195-96, 161 L.Ed.2d 1 (2005) (recognizing the "diminished culpability of juveniles" and their greater capacity for rehabilitation); Lyle , 854 N.W.2d at 400 (noting a juvenile's "greater capacity for growth and reform"). Thus, the juvenile court is able to relieve a juvenile sex offender from the registration requirements when rehabilitation under a dispositional order is achieved prior to expiration.
2. Sex offender registry requirements . Generally, when a juvenile is required to register as a sex offender, the registration begins on the date the juvenile delinquent is released from placement in a juvenile facility; the date the juvenile delinquent begins attending a public or private education institution as a student; or the date of conviction if probation, incarceration, or placement in a juvenile facility was not ordered as a disposition. See Iowa Code § 692A.103(1). Once registration occurs, numerous restrictions and requirements are imposed. Thus, we turn to consider the impact of the registration requirements on T.H.
T.H. was fourteen years old at the time of his offense. In its delinquency adjudication, *585 the juvenile court specifically found that T.H. committed the offense with force, as he used his hand to shove I.N.'s head toward his penis. Therefore, the juvenile court indeed lacked discretion to waive or defer his requirement to register as a sex offender, and it may not subsequently act to modify or terminate his registration requirement during the period of his dispositional order. For at least the duration of his dispositional order, T.H. must abide by the following terms of the sex offender registry.
T.H. must appear in person to register with the sheriff of each county where he resides, works, or attends school. Id. § 692A.104(1). If T.H. changes his residence, employment, or school he must notify the county sheriff within five business days. Id. § 692A.104(2). If T.H. moves to, works in, or attends school in a new jurisdiction, he must notify the sheriff in the county of his principal residence of his presence in the new jurisdiction. Id. § 692A.104(5). If T.H. plans to leave the county for more than five days, he must notify the sheriff of his intentions and provide the location and period of time that he will be staying out of the county. Id. § 692A.105. Every three months, T.H. must appear in person to verify the location of his residence, employment, and school. Id. § 692A.108(1)(c ). He will also pay an annual registration fee of twenty-five dollars. Id. § 692A.110(1).
Because T.H. committed an offense against a minor, he is subject to a number of exclusion zones and employment restrictions. He may not be present upon, nor loiter within 300 feet of, the property of an elementary or secondary school, except for the school he attends. Id. § 692A.113(1)(a )-(b ). He similarly may not be present upon, nor loiter within 300 feet of, the property of a public library, absent prior written permission by the library administrator. Id. § 692A.113(1)(f )-(g ). T.H. also may not be present upon, nor loiter within 300 feet of, the property of a child care facility, absent prior written permission by the facility. Id. § 692A.113(1)(d )-(e ). T.H. may not loiter on the premises of any facility for dependent adults, nor may he be present at an event that provides services or programming for dependent adults. Id. § 692A.115(1). Finally, T.H. may not be present upon nor loiter within 300 feet of
any place intended primarily for the use of minors including but not limited to a playground available to the public, a children's play area available to the public, a recreational or sport-related activity area when in use by a minor, a swimming or wading pool available to the public when in use by a minor, or a beach available to the public when in use by a minor.
Id. § 692A.113(1)(h ).
Throughout the duration of his registration, T.H. may not work or volunteer for a "municipal, county, or state fair or carnival when a minor is present on the premises." Id. § 692A.113(3)(a ). He also may not work or volunteer at a "children's arcade, an amusement center having coin or token operated devices for entertainment, or facilities providing programs or services intended primarily for minors, when a minor is present." Id. § 692A.113(3)(b ). T.H. similarly may not work or volunteer at a "public or nonpublic elementary or secondary school, child care facility, or public library." Id. § 692A.113(3)(c ). He is also prevented from working or volunteering at "any place intended primarily for use by minors including but not limited to a playground, a children's play area, recreational or sport-related activity area, a swimming or wading pool, or a beach." Id. § 692A.113(3)(d ). He may not work or volunteer for any business that "operates a *586 motor vehicle primarily marketing, from or near the motor vehicle, the sale and dispensing of ice cream or other food products to minors." Id. § 692A.113(3)(e ). As well, T.H. may not be employed by a "facility providing services for dependent adults or at events where dependent adults participate in programming." Id. § 692A.115(1).
Because T.H. is a minor, he is not subject to any residency restrictions. Id. § 692A.114(3)(e ). However, if T.H. is still required to register after becoming an adult, he will not be permitted to reside within 2000 feet of a school or child care facility. Id. § 692A.114(2). As well, should the juvenile court see fit, T.H. may be supervised by an electronic tracking and monitoring system. Id. § 692A.124(3).
T.H.'s registration information will be publicized on the sex offender registry website, which is searchable by "name, county, city, zip code, and geographic radius." Id. § 692A.121(1). The website will also publish T.H.'s full name, photographs, date of birth, home address, and physical description, including scars, marks, or tattoos. Id. § 692A.121(2)(b )(1)(a)-(e). The website provides the statutory citation and text of his offense, as well as informs the public whether T.H. is subject to residence restrictions, employment restrictions, and exclusion zones. Id. § 692A.121(2)(b )(1)(f)-(h).
Members of the general public may also contact the county sheriff's office and request additional information about T.H. A member of the public that contacts the sheriff and provides T.H.'s date of birth, which is publicized on the sex offender registry website, may request a list of schools T.H. has attended, the names and addresses of his current and former employers, locations and dates of any temporary lodging, and his vehicle information. Id. § 692A.121(5)(a )-(b ).
If T.H. violates any of the above requirements, he commits an aggravated misdemeanor. Id. § 692A.111(1). Any subsequent violation is a class "D" felony. Id. Additionally, if T.H. violates a registration requirement, he must "register for an additional ten years, commencing from the date [his] registration would have expired." Id. § 692A.106(4). T.H.'s registration term will be tolled until he resumes compliance with the statutory requirements. Id. § 692A.107(2).
T.H. is required to register for at least the duration of his dispositional order. Id. § 232.54(1)(i ). If the juvenile court determines that T.H. should remain on the registry beyond the duration of his dispositional order, T.H. will register for a minimum of ten years from the date of his initial registration. Id. § 692A.106(1). However, T.H. may petition for modification after five years if he satisfies a number of conditions. Id. § 692A.128(2). T.H. must complete all ordered sex offender treatment programs, submit to a risk assessment and be deemed a low risk to reoffend, not be incarcerated, and obtain a stipulation to the modification from the director of the judicial district department of correctional services. Id. However, if T.H. is no longer under the juvenile court or department of correctional services' supervision at the time he requests modification, he need not produce the stipulation. Id. § 692A.128(6). Accordingly, if T.H. abides by all of the registration requirements, completes all of the ordered treatment programs, and progresses to the point that he may be deemed a low risk to reoffend, he may be released from the obligation to register as a sex offender after five years.
C. Cruel and Unusual Punishment. T.H. alleges that mandatory sex offender registration, as applied to juveniles, is grossly disproportionate and, therefore, *587 constitutes cruel and unusual punishment in violation of the Iowa and United States Constitutions. See U.S. Const. amend. VIII ; Iowa Const. art. I, § 17. While we have previously heard similar challenges to the Iowa Sex Offender Registry scheme, we have not considered the issue in the context of juveniles, nor have we meaningfully considered a cruel and unusual punishment challenge in light of the significant legislative overhaul of the statutory scheme in 2009. Thus, while our prior sex offender cases are relevant considerations, they are not dispositive.
1. Sex offender registry as punishment . Before we can assess whether mandatory sex offender registration for certain juveniles is cruel and unusual, we must first determine that registration is, in fact, punishment. See State v. Crooks , 911 N.W.2d 153, 165 (Iowa 2018) (disposing of a constitutional challenge to Iowa's waiver provision for youthful offenders by concluding the statute was not punitive); see also Doe v. Miller , 405 F.3d 700, 723 n.6 (8th Cir. 2005) ("In view of our conclusion that the statute is not punitive, it follows that the law is not a 'cruel and unusual punishment' in violation of the Eighth Amendment."); Rainer v. State , 286 Ga. 675, 690 S.E.2d 827, 828 (2010) (finding sex offender registration did not constitute cruel and unusual punishment because registration is regulatory, rather than punitive, in nature).
To determine whether mandatory sex offender registration for certain juveniles is punishment, we find cases considering the issue in the context of ex post facto challenges instructive. In State v. Seering , we considered whether the 2000-foot residency restriction for certain offenders was sufficiently punitive to violate the ex post facto prohibition. 701 N.W.2d 655, 667 (Iowa 2005). To ascertain whether the provision was sufficiently punitive, we first considered whether the legislature intended the statute to be punitive, rather than civil, in nature. Id. "If the law was intended to be civil and nonpunitive, then we look to see if it is nevertheless 'so punitive either in purpose or effect as to negate' the nonpunitive intent." Id. (quoting Smith v. Doe , 538 U.S. 84, 92, 123 S.Ct. 1140, 1147, 155 L.Ed.2d 164 (2003) ).
Accordingly, we first consider whether, in mandating registration for juveniles over the age of fourteen who commit their crimes "by force or the threat of serious violence, by rendering the victim unconscious, or by involuntary drugging of the victim," the legislature intended to impose criminal punishment. Iowa Code § 692A.103(4). We have previously determined the legislative intent behind enacting chapter 692A was "to protect the health and safety of individuals, especially children, not to impose punishment." Seering , 701 N.W.2d at 667 ; see also In re S.M.M. , 558 N.W.2d 405, 408 (Iowa 1997) ("The purpose of chapter 692A is clear: to require registration of sex offenders and thereby protect society from those who because of probation, parole, or other release are given access to members of the public.").
Prior to 2009, the statute granted juvenile courts discretion with respect to all juveniles adjudicated delinquent of a qualifying offense. See Iowa Code § 692A.2(6) (2007) ("A person who is convicted ... of [a qualifying offense] as a result of adjudication of delinquency in juvenile court shall be required to register as required in this chapter unless the juvenile court finds that the person should not be required to register under this chapter."). In 2009, the legislature amended chapter 692A and revoked that discretion with respect to juveniles like T.H., who were at least fourteen years old at the time of their offense and who committed their offense through certain *588 aggravated means. 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)).
The legislature amended the chapter in an effort to more closely comply with the Federal Sex Offender Registration and Notification Act (SORNA), Title I of the Adam Walsh Child Protection and Safety Act of 2006. Maxwell v. Iowa Dep't of Pub. Safety , 903 N.W.2d 179, 185 n.4 (Iowa 2017) ; see generally 2009 Iowa Acts ch. 119 (amending Iowa Code ch. 692A). SORNA requires juveniles to abide by the registry requirements, including possible lifetime registration, if the juvenile was "14 years of age or older at the time of the offense and the offense adjudicated was comparable to or more severe than aggravated sexual abuse." 34 U.S.C. § 20911(8) (Westlaw through Pub. L. No. 115-173 ). But see id. § 20927(b)(1) (providing a state may avoid a noncompliance penalty if implementing certain SORNA provisions "would place the jurisdiction in violation of its constitution, as determined by a ruling of the jurisdiction's highest court"). SORNA was promulgated "[i]n order to protect the public from sex offenders and offenders against children." Id. § 20901. Thus, although the provisions have been amended since our decisions in Seering and S.M.M. , we believe the legislative intent behind our current sex offender statute remains protective and nonpunitive.
Nevertheless, we also consider whether the effects and impact of chapter 692A on juveniles is sufficiently punitive to render the scheme penal in nature. In this inquiry, we are guided by the Mendoza -Martinez factors, which consider whether (1) "the sanction involves an affirmative disability or restraint," (2) "it has historically been regarded as a punishment," (3) "it comes into play only on a finding of scienter," (4) "its operation will promote the traditional aims of punishment-retribution and deterrence," (5) "the behavior to which it applies is already a crime," (6) "an alternative purpose to which it may rationally be connected is assignable for it," and (7) "it appears excessive in relation to the alternative purpose assigned." Kennedy v. Mendoza-Martinez , 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-68, 9 L.Ed.2d 644 (1963).
a. Affirmative disability or restraint . Chapter 692A, as applied to juveniles, plainly imposes an affirmative disability or restraint. As discussed, juvenile registrants are hindered in meaningfully reintegrating into their communities upon release from treatment facilities or out-of-home placements. While juvenile registrants may continue to attend public school and are not subject to the 2000-foot limitation, they nevertheless may not be present upon, nor loiter within 300 feet of, "any place intended primarily for the use of minors." Iowa Code § 692A.113(1)(h ) (2016).
This restriction could prevent juveniles from participating in prosocial after-school activities, sports teams, and youth clubs that are available to their peers, which in turn severely limits their opportunities to develop communication and social skills with children their own age. Further, juveniles may not visit or loiter near public libraries, other elementary or secondary schools, and child care facilities. Id. § 692A.113(1)(a )-(g ). Juveniles who hope to obtain after-school or part-time employment are similarly limited in their options. See id. §§ 692A.113(3)(a )-(e ), .115. Thus, the statute in many respects isolates juvenile registrants from their peers outside of school hours.
Beyond actual exclusion zones, juvenile registrants must appear, in person, to register with the sheriff of the county in which they reside, attend school, or work. Id. § 692A.104(1). Juveniles like T.H. who were adjudicated of a tier III offense must *589 appear in person every three months to verify their residence, employment, and school. Id. § 692A.108(1)(c ); cf. Smith , 538 U.S. at 101-02, 123 S.Ct. at 1151-52 (finding Alaska's sex offender statute did not require in-person updates and, therefore, did not impose an affirmative restraint). In fact, the statutory scheme, which requires in-person check-ins, employment conditions, and the possibility of electronic monitoring, is strikingly similar to supervised probation. Despite the protective purpose of the registry's requirements, the totality of the obligations under the statute impose an affirmative restraint on juvenile registrants. This factor therefore weighs in favor of finding the statute punitive.
b. Historically regarded as punishment . We next consider whether compliance with the sex offender registry, for juveniles, entails conduct that is historically regarded as punitive. In Seering , we considered whether the 2000-foot rule was sufficiently akin to banishment. 701 N.W.2d at 667. We found the rule "only restricts sex offenders from residing in a particular area. Offenders are not banished from communities and are free to engage in most community activities. The statute is far removed from the traditional concept of banishment." Id. at 667-68.
In Smith , the Supreme Court considered an ex post facto challenge to Alaska's sex offender scheme. The Court rejected the comparison of Alaska's statutory requirements to banishment and public shaming. Smith , 538 U.S. at 98, 123 S.Ct. at 1150. The Court noted that colonial-era practices that required offenders to "stand in public with signs cataloguing their offense," branded murders with an "M" or thieves with a "T," and outright banished offenders from their original community, all involved "stag[ing] direct confrontation between the offender and the public." Id. at 97-98, 123 S.Ct. at 1150 (quoting Adam J. Hirsch, From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts , 80 Mich. L. Rev. 1179, 1226 (1982) (first quote)). Indeed, punishments "such as public shaming, humiliation, and banishment, involved more than the dissemination of information. They either held the person up before his fellow citizens for face-to-face shaming or expelled him from the community." Id. The stigma resulting from Alaska's sex offender laws, however,
results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment. On the contrary, our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.
Id. at 98-99, 123 S. Ct. at 1150.
While the dissemination of accurate information about a criminal record is not historically punitive for adults, juveniles are traditionally shielded from such publication. Under the juvenile court's jurisdiction, juveniles surrender certain procedural safeguards afforded to adults-namely a trial by jury-in exchange for the benefits of a confidential, rehabilitative system. Juvenile courts were built on the "idea [that]
*590 crime and punishment [were] to be abandoned. The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive." In re Gault , 387 U.S. 1, 15-16, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527 (1967). By sealing records, juvenile courts prevent youths from enduring lasting stigma for adolescent blunders.
In Iowa, juvenile courts generally exercise "exclusive original jurisdiction in proceedings concerning a child who is alleged to have committed a delinquent act unless otherwise provided by law." Iowa Code § 232.8(1)(a ). Unless a juvenile committed "a delinquent act that would be a forcible felony if committed by an adult," juvenile court records are, by default, "confidential and are not public records." Id. § 232.147(2) (2017). Indeed, even if a juvenile is alleged to have committed an act that would be a forcible felony if committed by an adult, juvenile courts may still order that the juvenile's court records be kept confidential if "the child's interest in making the records confidential outweighs the public's interest in the records remaining public records." Id. § 232.149A(1)(b ).
However, under a limited set of circumstances, juveniles may be prosecuted as adults and thus lose the confidentiality benefits of the juvenile system. The juvenile court must find that (1) the child is at least fourteen years old, (2) there is probable cause the child committed a delinquent act, and (3) "there are not reasonable prospects for rehabilitating the child if the juvenile court retains jurisdiction ... and that waiver ... would be in the best interests of the child and the community. Id. § 232.45(6)(a )-(c ) (2016). Thus, under our dual system, children are only removed from juvenile court jurisdiction and treated as adults when they are deemed to be deserving of punishment, rather than rehabilitative services.
In United States v. Juvenile Male , the United States Court of Appeals for the Ninth Circuit similarly acknowledged this distinction between juvenile confidentiality and adult publication. 590 F.3d 924, 937 (9th Cir. 2009), vacated on other grounds by 564 U.S 932, 937-39, 131 S.Ct. 2860, 2864-65, 180 L.Ed.2d 811 (2011). Whereas Smith noted that much of the disseminated information was already made public by virtue of the intentionally public criminal trial, the Ninth Circuit emphasized that "public availability of information is not , however, a traditional part of the rehabilitative juvenile justice system." Id. Indeed, the court found "[h]istorically, information from juvenile adjudications has been made public only when a juvenile's case is transferred to adult criminal court for punitive purposes ." Id. Because the decision to transfer a juvenile's case to adult court is "based in part on a prediction that rehabilitation is improbable," and that "juvenile's case merits punishment, rather than rehabilitation," publicizing a juvenile offender's identity and offense "is historically a central feature of a punitive rather than a rehabilitative system of justice." Id.
Other courts have concluded the registry's requirements are historically punitive. In In re Nick H. , the Maryland Court of Special Appeals found "requiring [the juvenile] to register has essentially the same effect on his life as placing him on probation. It is well-settled in this State that probation is a form of a criminal sanction." 224 Md.App. 668, 123 A.3d 229, 244 (2015) (quoting Doe v. Dep't of Pub. Safety & Corr. Servs. , 62 A.3d 123, 139 (Md. 2013) (plurality opinion)). Further, the court noted the "purpose of keeping [juvenile] records confidential is to further the rehabilitation of young offenders by relieving them of the enduring stigma of *591 their misconduct." Id. (alteration in original) (quoting District of Columbia v. Cooper , 483 A.2d 317, 323 (D.C. 1984) ); cf. In re C.P. , 131 Ohio St.3d 513, 967 N.E.2d 729, 735, 749 (2012) (noting the sex offender registry "changes the very nature of [a serious youth offender] disposition, imposing an adult penalty immediately upon the adjudication" and ultimately concluding the juvenile registration regime is unconstitutional).
Beyond the mere availability of a juvenile's records, the sex offender statute orders the mass publication of an offender's information to the state sex offender website. The Supreme Court considered this feature in Smith , but remained unmoved.
The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to the extent of the publicity. And the geographic reach of the Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.
The State's Web site does not provide the public with means to shame the offender by, say, posting comments underneath his record. An individual seeking the information must take the initial step of going to the Department of Public Safety's Web site, proceed to the sex offender registry, and then look up the desired information. The process is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality . The Internet makes the document search more efficient, cost effective, and convenient for Alaska's citizenry.
538 U.S. at 99, 123 S.Ct. at 1150-51 (emphasis added).
However, the Smith reasoning is less persuasive in 2018 than it was in 2003. In Commonwealth v. Perez , Judge Donohue of the Pennsylvania Superior Court offered a thoughtful concurrence on the viability of Smith 's reasoning in the modern, interconnected world.
The environment has changed significantly with the advancements in technology since the Supreme Court's 2003 decision in Smith . As of the most recent report by the United States Census Bureau, approximately 75 percent of households in the United States have internet access. Yesterday's face-to-face shaming punishment can now be accomplished online, and an individual's presence in cyberspace is omnipresent. The public internet website utilized by the Pennsylvania State Police broadcasts worldwide, for an extended period of time, the personal identification information of individuals who have served their "sentences." This exposes registrants to ostracism and harassment without any mechanism to prove rehabilitation-even through the clearest proof. In my opinion, the extended registration period and the worldwide dissemination of registrants' information authorized by SORNA now outweighs the public safety interest of the government so as to disallow a finding that it is merely regulatory.
97 A.3d 747, 765-66 (Pa. Super. Ct. 2014) (Donohue, J., concurring) (footnote omitted). Similarly, the court in Nick H. found *592 "[p]ublishing information about former juvenile sex offenders on a public website hardly provides confidentiality, and instead creates the 'enduring stigma of their misconduct.' " 123 A.3d at 244 (quoting Cooper , 483 A.2d at 323 ).
We find that mass publication of a juvenile's delinquency adjudication weighs in favor of finding the statute punitive. Juveniles are traditionally shielded from having their records publicized unless they are deemed to be in need of punishment and beyond rehabilitation. While a passive website is indeed different from colonial-era public shaming designed to create face-to-face encounters with the public, we disagree with the Smith Court's characterization of the website being akin to an archive of criminal records. Posting juveniles' personal information, including their full name, date of birth, annual photographs, home address, and physical description-including scars, marks, and tattoos-goes well beyond merely unsealing previously confidential records. The juvenile is publicly branded as deviant on a website known to and accessible by the juvenile's peers. While T.H.'s period of registration may be less than an adult's, a member of the public need only take a screen shot of the website to preserve T.H.'s presence forever-a possibility that is antithetical to the traditional treatment of juveniles within our justice system.
c. Scienter requirement . The third factor, whether the regulations are triggered upon a finding of scienter, was deemed to be "of little weight" to the Supreme Court's decision in Smith . 538 U.S. at 105, 123 S.Ct. at 1154. Indeed, we did not identify this factor as a relevant consideration in Seering , 701 N.W.2d at 667.
Other courts, however, have considered this factor in the context of sex offender registries. In Nick H. , the Maryland statute instructed that juveniles must register only if the court determined they posed a significant risk of reoffending. 123 A.3d at 244-45. The court found a "determination that the juvenile sex offender is at significant risk of reoffending logically implies that the juvenile court must find a significant risk of future criminal intent on the part of the juvenile offender." Id. at 244. The statute imposed no such prerequisite finding on adult offenders. Id. Accordingly, the court found the scienter factor to weigh in favor of the statute being punitive. Id. at 245.
Under Iowa's scheme, some juveniles are required to register pursuant to the court's discretion, and such a determination may require weighing the juvenile's intent to recommit. With respect to juveniles at issue in this case, however, there is no finding of scienter that triggers registration. Juveniles like T.H. must register, regardless of their risk of reoffending. Thus, the lack of a scienter requirement weighs in favor, albeit marginally, of finding the statute nonpunitive. See State v. Eighth Judicial Dist. Ct. (Logan D.) , 129 Nev. 492, 306 P.3d 369, 387-88 (2013) (finding juvenile registration was not premised on a scienter requirement and agreeing with the Supreme Court that the factor is "of little weight" to the analysis).
d. Promote traditional aims of punishment-retribution and deterrence . In Smith , the Court found "any number of governmental programs might deter crime without imposing punishment. Smith , 538 U.S. at 102, 123 S.Ct. at 1152. Indeed, "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would severely undermine the Government's ability to engage in effective regulation." Id. (second alteration in original) (quoting Hudson v. United States , 522 U.S. 93, 105, 118 S.Ct. 488, 496, 139 L.Ed.2d 450 (1997) ). Further, the Supreme Court found that Alaska's decision to impose *593 greater reporting requirements on repeat and aggravated offenders was not retributive, but rather "reasonably related to the danger of recidivism." Id.
Justice Souter concurred in the Smith decision, but expressed doubt that registration requirements purely served a protective purpose.
The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.
Id. at 109, 123 S. Ct. at 1155-56 (Souter, J., concurring in judgment). He further suspected that retribution was in fact a goal of the Alaska legislature, and other legislatures, when enacting sex offender statutes.
Widespread dissemination of offenders' names, photographs, addresses, and criminal history serves not only to inform the public but also to humiliate and ostracize the convicts. It thus bears some resemblance to shaming punishments that were used earlier in our history to disable offenders from living normally in the community. While the Court accepts the State's explanation that the Act simply makes public information available in a new way, the scheme does much more. Its point, after all, is to send a message that probably would not otherwise be heard, by selecting some conviction information out of its corpus of penal records and broadcasting it with a warning. Selection makes a statement, one that affects common reputation and sometimes carries harsher consequences, such as exclusion from jobs or housing, harassment, and physical harm.
Id. (citations omitted).
In Seering , we explained, "The nature of some governmental restrictions, especially those designed to protect the health and safety of children, may necessarily have some effects related to the goals of punishment." 701 N.W.2d at 668. We concluded any deterrent or retributive effects of the 2000-foot rule were "secondary and largely 'consistent with the regulatory objective.' " Id. (quoting Smith , 538 U.S. at 102, 123 S.Ct. at 1152 (majority opinion)).
In Logan D. , the Nevada Supreme Court considered whether juvenile registration promoted retribution by assigning more stringent registration requirements based on the offense committed, rather than the juvenile's individual risk to reoffend. 306 P.3d at 385. According to the juvenile, if heightened registration requirements were intended to guard against recidivism, they would be associated with individualized risk-assessments, rather than the prior offense. Id. The Nevada Supreme Court rejected this characterization. Id. Like the Supreme Court in Smith , the court found the "scheme of offense-based tiering is consistent with the statute's goal of protecting the public from recidivist juveniles [and] it is reasonable to conclude that juvenile offenders who have committed the most severe offenses pose the greatest risk to the public." Id. (footnote omitted).
We find this factor weighs in favor of finding the statute nonpunitive. While the registry certainly produces deterrent and retributive effects, requiring juvenile offenders to abide by exclusion zones and employment restrictions directly promotes the civil objective of alerting the public to the presence of a sexual offender. Although the severity of the requirements may incidentally deter individuals from *594 committing an initial offense, that fact does not detract from the primary purpose and effect of the statute, which is reducing the opportunities for juveniles who have committed aggravated sexual offenses to reoffend.
e. Applies to behavior that is already criminal . Like the scienter factor, the Smith Court did not find this factor to be useful in its analysis, and we similarly did not consider it in Seering . See Smith , 538 U.S. at 105, 123 S.Ct. at 1154 ; Seering , 701 N.W.2d at 667. The Court in Smith conceded that the "regulatory scheme applies only to past conduct, which was, and is, a crime," but nevertheless reasoned that "[t]his is a necessary beginning point, for recidivism is the statutory concern." 538 U.S. at 105, 123 S.Ct. at 1154.
In Young v. State , the Maryland Court of Appeals was similarly unpersuaded by the use of a criminal conviction to trigger the registry's requirements. 370 Md. 686, 806 A.2d 233, 249 (2002).
There are many occasions when legislatures attach both criminal and civil sanctions to the same act or omission. The fact that the statute is triggered by a criminal conviction does not undermine the Legislature's intent to create a sex offender registry to aid in the civil purpose of tracking the location of known sex offenders. The same is true as to restitution. Thus, although the connection between sex offender registration and past criminal behavior is clear, we accord only limited weight to this factor in light of the equally strong connection between registration and legitimate civil purposes.
Id.
The Iowa sex offender registry statute hinges upon a criminal conviction, and thus applies to conduct that is already a crime. However, we find Smith reasoning persuasive. When reducing recidivism is the nonpunitive goal, using a conviction of a sexual offense is a natural and nonsuspect means of achieving that goal. Thus, while this factor weighs in favor of finding the scheme punitive, it does so only slightly.
f. Rationally related to a nonpunitive purpose . We next consider whether mandatory sex offender registration for certain juveniles has a rational relationship to a civil purpose. In Seering , we found that, while the 2000-foot rule "has some punitive impact ... this factor underscores that a statute is not punitive merely 'because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance.' " 701 N.W.2d at 668 (quoting Smith , 538 U.S. at 103, 123 S.Ct. at 1152 ). Mandatory registration for juveniles who have committed aggravated sexual offenses clearly has a rational connection to the nonpunitive goal of protecting the community, especially children, from subsequent sexual offenses. Accordingly, this factor weighs in favor of finding the statute nonpunitive.
g. Excessive in relation to the nonpunitive purpose . The final Mendoza -Martinez factor is the most significant of the seven, as it considers whether the legislature's chosen means to carry out its legitimate interests are so excessive as to cross the line from a civil regulation to a criminal punishment. See Wallace v. State , 905 N.E.2d 371, 383 (Ind. 2009) (placing the greatest weight on this factor); Kellar v. Fayetteville Police Dep't , 339 Ark. 274, 5 S.W.3d 402, 409 (1999) (same). Importantly, the excessive inquiry "is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." Smith , 538 U.S. at 105, 123 S.Ct. at 1154.
*595 In Smith , the Supreme Court placed significant weight on the risk of recidivism. The Court explained "the [Alaska] legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is 'frightening and high.' " Id. at 103, 123 S.Ct. at 1153 (quoting McKune v. Lile, 536 U.S. 24, 34, 122 S.Ct. 2017, 2025, 153 L.Ed.2d 47 (2002) ). Indeed, "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." McKune , 536 U.S. at 33, 122 S.Ct. at 2024 ) (citing Bureau of Justice Statistics, U.S. Dept. of Justice, Sex Offenses and Offenders 27 (1997); Bureau of Justice Statistics, U.S. Dept. of Justice, Recidivism of Prisoners Released in 1983 6 (1997)); accord Smith , 538 U.S. at 103, 123 S.Ct. at 1153. In light of this serious risk, the Smith Court reasoned "the State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions without violating the prohibitions of the Ex Post Facto Clause." 538 U.S. at 104, 123 S.Ct. at 1153.
Yet, research published since the Smith decision in 2003 demonstrates that juvenile sex offenders exhibit drastically lower recidivism rates than their adult counterparts. The Iowa Sex Offender Research Council issued a report in 2013 that outlined the modern research. Div. of Criminal & Juvenile Justice Planning, Iowa Dep't of Human Rights, Iowa Sex Offender Research Council Report to the Iowa General Assembly 12 (2013), https://humanrights.Iowa.gov/sites/default/files/media/SORC_1-15-13_Final_Report_%5B1%5D.pdf, [https://web.archive.org/web/20170323233135/https://humanrights.iowa.gov/sites/default/files/media/SORC_1-15-13_Final_Report[1].pdf]. The Council explained "studies have found extremely low rates of sexual reoffending for juveniles and that sexual reoffending rates are much lower than non-sexual re-offenses even among high-risk juveniles committed to correctional facilities." Id. (citations omitted). Juvenile recidivism "for general delinquent behavior ranged from 8% to 58%, while recidivism for sex offenders fell at 5% to 14%." Id.
With respect to the effectiveness of sex offender registration, multiple studies "have shown no significant difference in re-offense rates between registered and non-registered juveniles." Id. (emphasis added). Moreover, juvenile
registration laws influence adjudication and charging practices. Fewer juveniles are adjudicated for mandatory registration offenses after laws requiring registration have gone into effect. As new policies apply harsher consequences for juvenile offenses, prosecutors become less likely to move forward on sexual assault charges. Additionally, after registry policy changes, the proportion of sex offense charges that were reduced to less severe charges increased significantly.
Id. Thus, juvenile recidivism is largely unaffected by the exclusion zones and employment restrictions of the sex offender statute. What is most affected by mandatory juvenile registration, then, is not the likelihood of reoffending, but rather the likelihood that a juvenile will be charged with or adjudicated delinquent of a sexual offense at all.
Furthermore, the "criminal sexual behaviors of adult sex offenders appear to be more 'the result of deeply ingrained and long-standing pathology.' " Phoebe Geer, *596 Justice Served? The High Cost of Juvenile Sex Offender Registration , 27 Dev. Mental Health L. 34, 42 (2008) (quoting Ayn Embar-Seddon & Allan D. Pass, Assessing, Managing, and Treating Juvenile Sexual Offenders , 2004 J. Inst. Just. Int'l Stud. 112, 114 (2004) ). Juvenile offenses, conversely, "appear to be more exploratory in nature than those committed by adults and to not signify permanent sexual deviance." Id. "[S]tudies suggest that many of those who commit sexual offenses as juveniles do so as a result of impulsivity and sexual curiosity, which diminish with rehabilitation and general maturation." In re J.B. , 630 Pa. 408, 107 A.3d 1, 17, 20 (2014) (finding SORNA's lifetime registration provision unconstitutional as applied to juveniles).
Smith 's premise that the "frightening and high" rates of recidivism justify the harsh impositions of the sex offender regime has proven untrue in the context of juveniles. Indeed, the primary justification for the sex offender registry-protecting the public from individuals especially prone to reoffending-is substantially diminished with respect to juvenile offenders. See Wallace , 905 N.E.2d at 383 ("[R]egistration systems are a legitimate way to protect the public from sex offenders. Of course if the registration and disclosure are not tied to a finding that the safety of the public is threatened, there is an implication that the Act is excessive.").
Ultimately, automatically registering certain juveniles, and thus publicly branding them as aberrant and widely disseminating their personal information, "makes more burdensome the punishment for a crime after its commission." State v. Myers , 260 Kan. 669, 923 P.2d 1024, 1043 (1996). Subjecting some juveniles to mandatory registration, without any prerequisite determination of the likelihood of reoffending, triggers "consequences to sex offenders that go beyond the state's interest in public safety." Doe v. State , 189 P.3d 999, 1018 (Alaska 2008). In light of the totality of the statute's impositions, coupled with the mass publication of the juvenile's personal information, we find that mandatory registration for juveniles is excessive in light of its nonpunitive purpose.
h. Balancing . Considering all of the Mendoza -Martinez factors, we conclude that mandatory sex offender registration for juvenile offenders is sufficiently punitive to amount to imposing criminal punishment. The statute imposes an affirmative restraint akin to supervised probation. It mandates the mass dissemination of offender records that are historically kept confidential to promote the juvenile's potential for rehabilitation. And the sheer number of restrictions imposed on juveniles, given the demonstrated low juvenile recidivism rate, is excessive in light of the civil purpose of preventing multiple offenses.
2. Cruel and unusual . Upon finding that mandatory sex offender registration for juveniles is sufficiently punitive to warrant imposing constitutional safeguards, we next consider whether the practice goes so far as to violate the constitutional prohibition against cruel and unusual punishment. Importantly, that a civil regulatory regime is so excessive as to render it effectively punitive does not, in turn, suggest that it is so egregious and nefarious that the punishment is impermissibly cruel and unusual.
T.H.'s cruel and unusual argument rests solely on his contention that the sex offender registry regime treats juveniles like him akin to adults, despite the "diminished culpability of juveniles." Roper , 543 U.S. at 571, 125 S.Ct. at 1196 ; see also Lyle , 854 N.W.2d at 398. He contends that, in the absence of any consideration of the mitigating factors outlined in Miller , mandatory registration for juveniles is grossly disproportionate *597 and therefore violative of the Iowa and United States Constitutions. See Miller v. Alabama , 567 U.S. 460, 477-78, 132 S.Ct. 2455, 2468, 183 L.Ed.2d 407 (2012) ; State v. Oliver , 812 N.W.2d 636, 650 (Iowa 2012).
On our review of chapters 232 and 692A above, we found that juveniles like T.H. are not in fact treated identically to adult offenders. Chapter 692A indeed strips juvenile courts of the discretion to suspend the initial registration requirement for certain aggravated juvenile offenders. Chapter 232, however, retains the juvenile court's authority to determine, at the time the dispositional order is terminated, whether it is in society's and the juvenile's best interests to continue the juvenile's sex offender registration. Accordingly, so long as a juvenile petitions to terminate his or her dispositional order prior to its expiration, the juvenile court retains authority to determine whether the child shall remain on the registry and abide by the regime's requirements akin to an adult.
We find this cooperative regime strikes a reasonable balance between protecting society from the risk of aggravated offenders committing subsequent offenses and accounting for the youthful circumstances of juvenile offenders. The legislature has opted to place aggravated juvenile offenders on the sex offender registry throughout the duration of their dispositional order, which is directly tied to the juvenile's period of rehabilitation. We find it is not excessively severe for the legislature to put additional constraints in place during the period when a juvenile adjudicated delinquent of an aggravated sexual offense is receiving reformative services, but has not yet been deemed rehabilitated. Because we find the statute's imposed punishment is not grossly disproportionate, "no further analysis is necessary." Seering , 701 N.W.2d at 670 (quoting State v. Cronkhite , 613 N.W.2d 664, 669 (Iowa 2000) ).
IV. Conclusion.
For the foregoing reasons, we affirm the decision of the court of appeals.
DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.
Appel, J., concurs in part and dissents in part, joined by Wiggins and Hecht, JJ. Mansfield, J., files a separate concurrence in part and dissent in part, joined by Waterman and Zager, JJ.

A dispositional order can automatically terminate by operation of law when a juvenile reaches a certain age or it can terminate at the hand of the juvenile court prior to its expiration. See Iowa Code § 232.53 (governing duration of dispositional orders). The requirement for the juvenile court to determine if a child shall remain on the sex offender registry only applies when the court terminates a dispositional order requiring the child to register as a sex offender "prior to its expiration." Id. § 232.54(1). Thus, if a dispositional order expires by operation of law, the juvenile offender remains on the sex offender registry.