**IN THE COURT OF APPEALS OF IOWA**

No. 19-0416
Filed March 18, 2020

**IN THE INTEREST OF J.F.,**
**Minor Child,**

**J.F., Minor Child,**
    Appellant.
_____

    Appeal from the Iowa District Court for Floyd County, Karen Kaufman Salic,

District Associate Judge.

    J.F. appeals a juvenile court order adjudicating him delinquent on one count

of sexual abuse in the third degree.  **AFFIRMED.**

    Danielle M. Ellingson of Eggert, Erb, Kuehner & DeBower, P.L.C., Charles

City, for appellant.

    Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

    Considered by Bower, C.J., and May and Greer, JJ.

**GREER, Judge.**

J.F. appeals a juvenile court order adjudicating him delinquent based on findings he committed the delinquent act that would constitute one count of sexual abuse in the third degree if he was an adult.[1] The key challenge is sufficiency of the evidence to support the adjudication.

"We consider the sufficiency of the evidence in juvenile delinquency adjudications de novo." *In re T.H.*, 913 N.W.2d 578, 582 (Iowa 2018). "Although we give weight to the factual findings of the juvenile court, especially regarding the credibility of witnesses, we are not bound by them." *In re A.K.*, 825 N.W.2d 46, 49 (Iowa 2013). "We presume the child is innocent of the charges, and the State has the burden of proving beyond a reasonable doubt that the juvenile committed the delinquent acts." *Id.*

The fighting issue boils down to a "he says, she says" dynamic. The State asserts J.F. committed sexual abuse in the third degree with another minor. J.F. denies any sexual abuse occurred. "Any sex act between persons is sexual abuse by either of the persons when the act is performed with the other person in any of the following circumstances: . . . 3. Such other person is a child." Iowa Code § 709.1(3). A person commits third-degree sexual abuse "when the person performs a sex act under" several circumstances, including when "[t]he other person is twelve or thirteen years of age." *Id.* § 709.4(1)(b)(2). A sex act includes

---

[1] A violation of state law that would constitute a public offense if committed by an adult is a delinquent act when committed by a minor child. *See* Iowa Code § 232.2(12)(a) (2017). Here, the public offense in question was performing a sex act upon a person who was twelve or thirteen years of age. *See* Iowa Code § 709.4(1)(b)(2).

"any sexual contact between two or more persons by . . . [c]ontact between the finger or hand of one person and the genitalia . . . of another person." *Id.* § 702.17(2). "[S]kin-to-skin contact is not required in order to establish a 'sex act' under section 702.17." *State v. Pearson*, 514 N.W.2d 452, 455 (Iowa 1994).

To respond, J.F. contends there is insufficient evidence of any criminal act. At the core of this delinquency proceeding are S.F.'s allegations against her schoolmate J.F. The events took place over three days during the winter of 2017–2018. The juvenile court called these days "Days 1–3," but the exact dates and order of events were unclear. The court noted "that it occurred before April [2018] and while S.F. was 12 years old." On each of these three days, S.F. went over to the house of her classmate, K.B., to do homework and play.

On Day 1, S.F. testified she remembered jumping on the trampoline at K.B.'s house. K.B. did not remember exactly what day this happened, but "it was a day separate from the other two instances and [she] could not remember if it was before or after." Regardless, both girls recalled two male peers, J.F.—whose backyard connected with K.B.'s at the boundary corner—and I.R., coming over that day. Both girls also remembered that while the boys were at K.B.'s, they ran away with S.F.'s boots and did not give them back until K.B.'s mother intervened.

S.F. testified that the same day, J.F. asked if they wanted to go to his house to play. K.B. testified this happened on a different day, a Wednesday. The juvenile court identified this as happening on Day 2, which it also identified as a Wednesday. In any event, the girls went to J.F.'s house and while there, K.B. played basketball in the backyard with J.F., I.R., and another boy, E.J. It is unclear whether S.F. also played basketball with them, but there is no dispute that she was

present. At some point, S.F. and the boys began playing a game called "Smash or Pass," in which someone names a person and another participant replies with whether they would have sex with that person. K.B. was not involved in the game. K.B. testified that everyone else also played truth or dare and she overheard someone—she believed it was S.F.—say, "I dare you to touch my boobs." K.B. glossed over this comment and did not see if anything happened afterward. K.B. left before the other children to get ready for church, which she often attended on Wednesday nights.

After K.B. left, S.F. and the boys kept playing Smash or Pass. S.F. testified that the game became awkward but she continued to play along. Then, J.F. and E.J. began "hovering" beside S.F., one on either side of her, close enough that their sides were touching her. S.F. stated that all three boys began touching her body over her clothes with their hands. According to S.F., all three boys touched her buttocks, and J.F. and E.J. touched her vagina.[2]

The next day, which the juvenile court called Day 3, but which S.F. recalled being Day 2, S.F. and K.B. went over to J.F.'s house to play with him and the two other boys. K.B. left when it got dark out. S.F. stayed and "played along" with the boys. S.F. claims that at some point, the boys told her to bend over and each boy took a turn humping her from behind, touching their penises to her buttocks while clothed. Then, J.F. and E.J. touched S.F.'s breasts over her shirt. They next asked S.F. to pull up her shirt, S.F. complied, and J.F. and E.J. touched her breasts again

---

[2] The State filed delinquency petitions against all three boys, and their adjudicatory hearings were held together. Only J.F.'s delinquency adjudication is at issue in this appeal.

underneath her shirt. After that, J.F. pulled up a pornographic video on his cell phone. While watching the video, J.F. rubbed S.F.'s thigh, touched her vagina over her clothes, and had her touch his penis over his clothes.

S.F. testified she, her siblings, and K.B. went to J.F.'s house one other time. K.B. recalled it being the next day, a Thursday. S.F. recalled playing hide and seek; K.B. recalled playing tag. S.F. testified that during the game J.F. made a comment about his penis, but no sexual contact occurred that day.

Eventually, S.F. told her school guidance counselor about what had happened while she was at J.F.'s house. She also told her mother. She underwent a forensic interview, and the police began investigating. The State filed a delinquency petition.

At the contested adjudicatory hearing, the court heard testimony from S.F., K.B., the school guidance counselor, the forensic interviewer, an investigator with the local police department, and J.F.'s mother. None of the boys testified at the hearing, as was their right.

S.F. was thirteen at the time of the adjudicatory hearing. During her testimony, she had to be reminded several times to move the microphone closer and speak loudly enough for the court to hear. The court reporter noted S.F. had "no audible response" many times while she was testifying. Both the court and the prosecutor had to remind S.F. that even though she was nervous she had to speak up. Several times, S.F. stated that she did not remember or did not know what happened when asked about the events of the three days but then would testify about what happened. She also acknowledged that she had changed her testimony from an earlier deposition when she said the boys had humped her after

she dropped her phone and bent down. She testified that she had lied earlier because she was scared.

To explain the inconsistencies, the forensic interviewer testified that it was rare for someone who has experienced abuse to recall the specific date on which an incident occurred. She also testified that people vary in how they remember events that happened on more than one occasion, with some people remembering each separate incident, and some people meshing the incidents together. Then, the police investigator testified about his investigation generally as well as about interviews he did with J.F. and the other boys. During this interview, J.F. denied the allegations.

In his defense, J.F.'s mother testified that J.F. would not have been home during the periods of time that S.F. alleged if it was during basketball season. She also observed that J.F. and I.R. would not have hung out at her house until November 21, but, after that, I.R. "was over quite a few times," sometimes when she was not home. She recalled several instances when E.J. was at her house and he and J.F. were outside playing basketball. She maintained that while she was not home some evenings, her children would not have played outside because it was against her rules. J.F.'s mother submitted a calendar showing the dates of J.F.'s basketball practices.

After the hearing, the juvenile court determined the State had proved J.F. committed the delinquent act that would constitute sexual abuse in the third degree beyond a reasonable doubt because

> [J.F.] touched his hand to S.F.'s vagina over her clothing on Day 2 after having discussed whether or not they would like to have sex with each other. On Day 3, he rubbed his penis against S.F.'s

buttocks, grabbed her breasts over and under her shirt, viewed pornography with her on his phone, touched his hand to S.F.'s vagina over her clothing and had her touch his penis over his clothing with her hand.  These sex acts were done while two other boys were engaging in similar contact with S.F.  S.F. was 12 or 13 when these acts occurred.

The court found S.F.'s testimony credible and noted that, while K.B. did not witness any touching, K.B.'s testimony corroborated S.F.'s about the general events of the three days.  Important to the court was the fact that

> [s]hortly after Day 3, [K.B.] and S.F. had a falling out . . . .  [T]he fact that they are not friends any longer and that their version of events are fairly consistent does lend credibility to both of them as they clearly have not conspired to fabricate a story against any of the boys.

In the end, the court did not find J.F.'s mother's testimony compelling.  The court noted, "While [J.F.'s mother] is overly confident that her children never go outside or have friends over without her knowing, it seems these incidents would not have occurred much earlier than the end of November."  The court discounted the mother's testimony because "there is about a 3–4 month window of when this could have occurred" and the calendar entries proved nothing "other than she works until 4 and there are some afternoons when she is not home for at least a period of time."

On appeal, J.F. argues reasonable doubt exists, claiming because the juvenile court misstated the facts and S.F.'s testimony was not credible, the State failed to prove beyond a reasonable doubt that a sex act occurred.  J.F. claims that because the court "muddled" the facts about each day, and because some testimony is conflicting, there is insufficient evidence to adjudicate him delinquent.  J.F. sees these misstatements as the court "grasping to find truth in testimony for

an [a]djudication." J.F. also alleges that S.F. was not a credible witness because she had no response to many questions, could not answer certain questions, said she did not remember many facts, and admitted she had not told the truth.

After a de novo review of the record, we conclude there was sufficient evidence for the district court to find that J.F. committed the delinquent act that would constitute sexual abuse in the third degree. There is no dispute that S.F. was twelve years old when the alleged sex acts occurred. Her descriptions of the sex acts remained consistent overall. Furthermore the described behaviors fit the definition of sex acts. The juvenile court was in the best position to observe S.F.'s demeanor and judge her credibility. We give weight to the juvenile court's credibility findings. *See T.H.,* 913 N.W.2d at 583 ("Upon our de novo review, we also consider the findings of the juvenile judge who heard the testimony and evaluated the credibility of the witnesses."). After considering all the evidence presented, we find there was sufficient evidence to adjudicate J.F. delinquent.

**AFFIRMED.**