# IN THE COURT OF APPEALS OF IOWA

No. 19-0278
Filed June 3, 2020

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**TRISTIN ALDERMAN,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Scott County, Mary E. Howes, Judge.

　　　　The defendant appeals from his convictions of first-degree murder, first-degree robbery, and conspiracy to commit first-degree burglary. **CONVICTIONS AFFIRMED; SENTENCE VACATED IN PART AND REMANDED.**

　　　　Lauren M. Phelps, Hudson, Florida, for appellant.

　　　　Thomas J. Miller, Attorney General, and Israel Kodiaga, Assistant Attorney General, for appellee.

　　　　Considered by Tabor, P.J., and May and Greer, JJ.

**GREER, Judge.**

Tristin Alderman appeals from his convictions of first-degree murder, first-degree robbery, and conspiracy to commit first-degree burglary. Alderman (1) maintains the trial court abused its discretion in twice granting the motions to continue of Alderman's co-defendant; (2) contests several evidentiary rulings of the court; (3) challenges the sufficiency of the evidence supporting his convictions; (4) argues the court impermissibly sentenced him to consecutive terms of incarceration and considered improper factors when doing so; and (5) challenges the portion of the court's sentencing order requiring Alderman to pay attorney fees and court costs as part of restitution.

## I. Background Facts and Proceedings.

In March 2018, Alderman was charged with first-degree murder, first-degree robbery, and conspiracy to commit first-degree burglary. The charges stemmed from a September 22, 2017 home invasion and killing of Alderman's friend, Brady Tumlinson.

In the early morning hours of September 22, someone kicked in the front door of the home Tumlinson shared with his girlfriend, Jacey Grubbs. The person immediately entered Tumlinson and Grubbs' bedroom and began shooting. Tumlinson, using the handgun he kept next to the bed, returned fire, and the shooter fled.

Tumlinson and Grubbs were both struck with several gunshots and sustained severe injuries. Tumlinson died of the injuries caused by the gunshot wounds while still lying in the bed. Grubbs, who was pinned underneath him and unable to move, remained in the bed for several hours before a neighbor heard

her calls for help and called 911. During their investigation in the home, officers found marijuana and cash.

While canvassing the neighborhood, officers learned a home near Tumlinson's had a security system that recorded footage of the street in front of the nearby home. Recordings from the early morning hours of September 22 showed five individuals, dressed mostly in black, running by the nearby home at 12:39 a.m.

At approximately 8:30 a.m. on September 22, about an hour after police and medical personnel first arrived at the home, Alderman walked up to the crime scene. He told officers that he lived in the neighborhood and was a long-time friend of Tumlinson. A detective on the scene, thinking Alderman may be able to help provide information about Tumlinson's life that would aid in the investigation, asked Alderman to go to the police station to answer some background questions about Tumlinson. Alderman refused but told officers that on his walk to Tumlinson's home that morning, he noticed a pair of bloody gloves in the road. Alderman walked officers to the location of the bloody gloves. Alderman also told the officers he had been trying to contact Tumlinson in the early morning hours but had received no response. When they asked, Alderman showed the officers some things on this phone, including multiple text messages Alderman sent Tumlinson between 1:10 and 1:24 a.m. earlier that morning. Alderman reported he sent the first couple text messages from his home and then began walking toward Tumlinson's home—about five blocks away. He stated he walked to the corner near where the bloody gloves were later located and sent a couple more texts from there. When he did not receive a response from Tumlinson, he walked back home

because, as Alderman told the police, Tumlinson did not like it when people showed up at his home unexpectedly.

Within a few hours, officers obtained a warrant to search Alderman's home. During the search, the officers located and confiscated a box of gloves they believed matched the pair of bloody gloves found in the street. Additionally, Alderman's mother, who ran her own cleaning business, told officers that she was missing a box of gloves. The officers did not search the garage of the home during the execution of the search warrant, although it was within the areas they were allowed to search.

While at the police station later the same day, Alderman told officers he walked to Tumlinson's home between 12:00 and 1:00 a.m. that morning. He reported he walked all the way to Tumlinson's home—into his yard even—before ultimately walking back home. During the same interview, officers asked Alderman who he had talked to the night leading up to Tumlinson's death. Alderman reported being in contact with a woman and "Cory." He did not tell police he was in contact with Nakita Wiseman or Christopher Dixon.

About two days later, on September 24, Alderman's mother called the police and reported finding suspicious items in her garage. When officers responded to the call, Alderman's mother directed officers to clothing items in the garage that she stated she did not recognize. The clothing items were generally black and included a hooded sweatshirt, found inside out; a jacket; black boots; black, fabric gloves; and a black bandana with a white pattern on it, found with the ends tied together. A BB gun, with the tip painted black, was also located in the same area of the garage. The sweatshirt, when turned back as one would usually wear it,

had a marijuana leaf and the words "DON'T PANIC IT'S ORGANIC" on the front. Additionally, a pair of plastic or latex gloves were found outside, near the garage. Some of the clothing was later tested for DNA. With the bandana, the criminalist who performed the testing found a mixture of DNA from two individuals. The profile of the major DNA contributor matched the DNA profile of Alderman. The factors present from the minor contributor were insufficient to identify the contributor.

Alderman was initially charged in a joint trial information with Nakita Wiseman. Each was charged with first-degree murder, first-degree robbery, and conspiracy to commit first-degree burglary.

A couple months later, in accordance with a plea agreement he reached with the State, Wiseman pled guilty to the lesser-included offenses of robbery in the second degree and the later-added charge of burglary in the first degree. As part of the agreement, Wiseman agreed to testify truthfully about his and any codefendants' involvement "in any trial that may result regarding the robbery and homicide of Brady Tumlinson," and the State agreed to dismiss the charges for murder in the first degree and conspiracy to commit burglary in the first degree.

In May 2018, the State filed a motion to join the trial of Alderman and Dmarithe Culbreath, who had also been charged with first-degree murder, first-degree robbery, and conspiracy to commit first-degree burglary regarding the events of September 21 and 22, 2017. The State argued, "[T]he set of facts are the same for both defendants and it involves the same incident, that being the two defendants conspired with each other and other accomplices, and acted in concert together to commit a robbery and homicide." Alderman initially resisted the State's motion.

The court set a hearing on the motion to join the two cases for July 3. At the hearing, with the State, Culbreath, and Alderman present, neither Alderman nor Culbreath resisted the State's motion to join the two trials. Culbreath informed the court he had just recently filed a motion to continue, stating he could not be ready for the August 13 trial date previously scheduled for Alderman. The State noted its main concern was trying the two cases jointly and asked that if the court granted Culbreath's motion to continue, it also continue Alderman's trial as well to prevent a "de facto severance" of the two. Alderman resisted any motion to continue.

From the bench, the court granted the State's motion to join the two trials, finding it was "in the interest of judicial economy" to do so. The court also granted Culbreath's motion to continue, relying on the facts Culbreath was only recently arraigned, his counsel had been recently appointed, and his counsel had depositions scheduled for late July. And, because the court had just joined the two trials and granted Culbreath's motion to continue his trial, the court granted the State's motion to continue Alderman's trial too.

The joint trial of Alderman and Culbreath was scheduled to begin November 26, 2018. That morning, Culbreath orally moved for a continuance, citing issues with witness availability for an "essential" witness who was in federal custody. Alderman resisted, noting the unavailable witness was not an essential part of his defense. Additionally, he asked the court to sever the two cases so his trial could proceed as scheduled if the court granted Culbreath's second motion to continue. The State resisted Culbreath's motion to continue and Alderman's motion to sever.

The court granted the motion to continue the trial over Alderman's and the State's objections and denied Alderman's motion to sever. Trial was continued until December 10.

At trial, the State offered evidence that Tumlinson and Alderman's friendship was strained in the weeks leading up to Tumlinson's death—including phone records showing Tumlinson generally not responding to Alderman's text messages or calls. On September 10, after Alderman sent Tumlinson a number of text messages without Tumlinson responding, Tumlinson responded with a text message stating in part, "Bro if you don't stop hitting my god damn phone up ima beat tf outta you."

The State called Wiseman to testify at trial. According to Wiseman, he was at his house on September 21 when Alderman called and said he had some money for him. Wiseman thought that statement could mean "a number of things. [He] just went to find out." Alderman drove to Wiseman's home, picked Wiseman up, and then the two of them went to Alderman's house. At some point during the day, Alderman told Wiseman about the "lick"—a robbery.[1] Alderman told Wiseman the location and walked him past Tumlinson's home. Sometime after it got dark, Alderman and Wiseman walked from Alderman's home to the nearby grocery

---

[1] At trial, Wiseman testified on direct examination:
A. [Alderman] said we were going to do a robbery.
    Q. When he said you were going to do a robbery, do actually—or did he actually use the word "robbery"? A. No. Nobody ever use the word "robbery."
    Q. What word did he use? A. A lick.
    Q. I'm sorry? A. A lick.
    Q. And that's street name for a robbery or street code for a robbery? A. Yes.

store, where they met Christopher Dixon in the parking lot. Alderman and Wiseman got in Dixon's car, and Alderman showed Dixon the location of Tumlinson's house. Afterward, Dixon dropped Alderman and Wiseman off at Alderman's home, saying he would be back. Dixon returned in his vehicle, with two other men, Culbreath and Culbreath's friend,[2] in a second vehicle. Dixon picked up Alderman and Wiseman. Dixon, driving the lead car, drove toward Tumlinson's home, with the two cars ultimately parking a block or two away. Wiseman testified Dixon stayed behind while the rest walked toward Tumlinson's house. At that point, they were "dressed in all black" and wearing gloves that someone—either Culbreath or Alderman—had passed out. When they got to the house, Alderman pointed out a window and said it was Tumlinson's bedroom. At this point, Wiseman knew that both Culbreath and his friend had guns with them; while Alderman had a BB gun with him. Either Culbreath or his friend kicked in the front door while Wiseman and Alderman stood behind them. Wiseman did not make it into the house because "the shots [were] fired instantaneously." Both Alderman and Wiseman took off running back to Dixon's car. As he got back to Dixon's car, Wiseman saw Culbreath and his friend returning to their vehicle as well. The two vehicles left, with Dixon dropping Alderman and Wiseman off back at Alderman's home once again. Wiseman wanted to leave Alderman's house, but he did not have a vehicle and his phone did not have a charge. He used Alderman's phone to call his "sister" to have her pick him up. The sister did not know how to find Alderman's home, so Wiseman had Alderman give directions

---

[2] Wiseman described the fifth man, who the State maintained was Darrell Williams, but Wiseman never provided the name of the fifth person during his testimony.

over the phone. On cross-examination, Wiseman was asked about the fact that he told police that "nobody said what you were looking for or what was in" Tumlinson's home. Wiseman responded, "Well, when you are doing a robbery, you are either looking for two—one or two things, drugs or cash."

As part of their investigation, officers received and reviewed the data from several different cell phone numbers and the content of those individuals' phones, including that of Alderman. Alderman received text messages from a contact he had saved as "Dad" in his phone, including one on September 16, 2017, in which "Dad" sent:

> Not sure why I get put in middle of everyone's shit. But, it's beginning to really wear the fuck on me. As far as I am concerned with everyone, is this . . . blowing peoples phone up, getting mad cause they won't respond, not showing up when they say, is NOT my problem, but yet everyone gets mad at me. I don't want to be a part of nothing. I want dude gone from my house, but he won't leave. You need to have faith in Me! Stop worry[ing] about money, you are trying to[o] hard to be something. PLEASE! Stop competing with Brady. You have a son to worry about. Don't miss out on his life like I missed out on yours.

Another message from "Dad" to Alderman's phone, sent on September 20, stated, "Plz quit already! You are out of control. [I'm] not sure what you are talking about. But doesn't sound good." Both of these messages were deleted from Alderman's phone.

Other content from Alderman's phones showed contact between Wiseman and Dixon on September 21 and the early morning hours of September 22.

Culbreath testified at trial. As other witnesses had established, Culbreath presented at a local emergency room at 1:13 a.m. on September 22 with a gunshot

wound to the head. Hospital surveillance shows Darrell Williams[3] at the hospital too. Culbreath, who was still able to walk and talk, was interviewed by police officers who sought information regarding how Culbreath was injured. The account Culbreath gave them, which involved an outdoor disturbance he happened to walk past, was quickly shown to be false. Later testing by the state crime lab showed the bloody gloves found on the road and bullet fragments recovered from Tumlinson's home had DNA on them consistent with that of Culbreath. At trial, Culbreath admitted he was at Tumlinson's during the home invasion and that he received the gunshot wound to the head there. Culbreath said he was with Williams on the night in question; Williams drove them to a residential neighborhood and parked the car on a street, behind Dixon's car. Culbreath testified Alderman got out of Dixon's car and handed out gloves for them to wear. As they walked toward the house, Alderman told Culbreath "[t]hat he got fucked out of some money." Once they got up to the home, Alderman "went up to the window and said, 'This is where everything should be at. This is where things should be.'" Culbreath testified Alderman also said, "As soon as you go into the house, turn right, and there's a bedroom there."

Alderman did not present any independent evidence before resting his case.

The jury convicted him as charged of first-degree murder, first-degree robbery, and conspiracy to commit first-degree burglary. Alderman was later

---

[3] This may not be the correct spelling of Williams's first name; it is spelled different ways in different parts of the record before us, and we have no way of ascertaining which is the correct spelling.

sentenced to a lifetime term of incarceration on the murder conviction. The court ordered his twenty-five year sentence for robbery to be served consecutively to the lifetime sentence.

Alderman appeals. We address each of his appeal issues below.

**II. Discussion.**

**A. Motions to Continue.** The court granted two motions to continue trial over Alderman's resistance. The first, made by the State in July 2018, was in response to the court joining Alderman's trial with Culbreath's and Culbreath moving for a continuance. The second motion was made by Culbreath on the morning the November 26 trial was scheduled to begin due to unavailability of a witness "essential" to Culbreath's defense—but not Alderman's. Alderman maintains the court abused its discretion in granting each of the continuances. *See State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012) ("We generally review a district court's denial of a motion for continuance for an abuse of discretion.").

"Motions for continuance are discouraged," and "[a] motion for continuance shall not be granted except upon a showing of good and compelling cause." Iowa R. Crim. P. 2.9(2). But "a trial court has 'very broad' discretion in ruling on a motion for a continuance." *See State v. LaGrange*, 541 N.W.2d 562, 564 (Iowa Ct. App. 1995) (citation omitted). And we will not "reverse[] on appeal unless an injustice has resulted." *State v. Leutfaimany*, 585 N.W.2d 200, 209 (Iowa 1998).

While Alderman resisted the July motion to continue, he did not reassert a resistance to the motion to join the two trials once he learned that Culbreath could not be ready for the scheduled August trial date. Culbreath had been only recently arraigned and appointed counsel, and his counsel needed more time to conduct

discovery and prepare for trial. The case was not a simple one, and Culbreath—like Alderman—was facing a life sentence if convicted of murder in the first degree. "Whether in any case enough time has been afforded for consultation, investigation for witnesses and preparation of the law and facts depends on the circumstances of the case including the complexity of the factual issues and the legal principles involved." *State v. Watt*, 389 N.W.2d 408, 410 (Iowa Ct. App. 1986) (citation omitted). Here, where Alderman did not resist the joining of the two trials, and with good cause for the continuance of Culbreath's trial, we cannot say the court abused its discretion in granting the July motion to continue.

As for the November motion to continue, the two-week delay granted by the district court allowed Culbreath to obtain the testimony of a witness he believed was essential to his defense.[4] Because the court also granted the motion to continue Alderman's trial (rather than severing the two), the State was able to prosecute both defendants for first-degree murder in a single trial—a trial that lasted eight days and involved more than twenty witnesses for the State. *Cf. State v. Romer*, 832 N.W.2d 169, 182–83 (Iowa 2013) (considering the State's interest in judicial economy in determining whether the court should sever multiple charges against a single defendant). Alderman has not established that injustice resulted from the two week continuance.

---

[4] We recognize the witness ultimately had little value, as he answered that he did not remember to every question that was asked of him and denied that a recording of an interview would refresh his recollection. But that was not known at the time Culbreath asked for the continuance. "We call upon our trial judges to do justice to those needing and deserving a continuance, while at the same time resolutely moving the trial assignment toward the speedy resolution of cases." *State v. Teeters*, 487 N.W.2d 346, 348 (Iowa 1992). "From its closer vantage point, the trial court can better sort through these matters than an appellate court can." *Id.*

We cannot say the court abused its discretion in granting the July and November motions to continue.

**B. Evidentiary Rulings.**  Alderman challenges several of the evidentiary rulings the district court made throughout the trial.  "We review the district court's evidentiary rulings for abuse of discretion." *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013).  "An abuse of discretion occurs when a district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Wilson*, 878 N.W.2d 203, 210–11 (Iowa 2016).

Before addressing Alderman's specific claims, we note that it is not enough for a party to simply urge on appeal that the district court erred in overruling an objection.  *See State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005), *superseded by statute on other grounds,* 2009 Iowa Acts ch. 119, § 3 (codified at Iowa Code § 692A.103 (Supp. 2009)), *as recognized in In re T.H.*, 913 N.W.2d 578, 587–88 (Iowa 2018); *Soo Line R.R. Co. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) ("[Litigant's] random mention of this issue, without elaboration or supportive authority, is insufficient to raise the issue for our consideration."); *In re Det. of West*, No. 11-1545, 2013 WL 988815, at *3 (Iowa Ct. App. Mar. 13, 2013) ("We do not consider conclusory statements not supported by legal argument."). The appellant must develop arguments and cite authority to enable our review of the decision made by the district court.  *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *State v. Adney*, 639 N.W.2d 246, 250 (Iowa Ct. App. 2001) ("When a party, in an appellate brief, fails to state, argue, or cite to authority in support of an issue, the issue may be deemed waived.").  It is not appropriate for us to, and we will not,

initiate research or form arguments on behalf of the appellant. *See State v. Coleman*, 890 N.W.2d 284, 304 (Iowa 2017) (Waterman, J., dissenting) ("Judges cannot assume the role of a partisan advocate and do counsel's work."); *see also Venckus v. City of Iowa City*, 930 N.W.2d 792, 806 (Iowa 2019) ("We will not piece through the petition and advance arguments the parties have not made. 'Judges are not like pigs, hunting for [meritorious] truffles buried in [the record].'" (alterations in original) (citation omitted)).

1. *Photos of bedroom.* Alderman purportedly challenges the court's admission of exhibits 13 and 14 as cumulative to exhibit 16. The two challenged exhibits are similar to each other; both are photographs of Tumlinson and Grubbs' room, taken on the morning of September 22. Both show the mattress, which was stripped of bedding and stained with blood. Additionally, Tumlinson's body, which had been moved to the floor while medical personnel aided Grubbs, is partially visible at the edge of both photographs. Exhibit 16 shows another angle of the room, with less of the mattress and more of Tumlinson's body visible.

However, on appeal, Alderman merely states that the challenged exhibits are cumulative to exhibit 16 and, therefore, his objection to them should have been sustained. He does not cite authority to support his general premise that cumulative evidence is inadmissible. And he does not assert that he was prejudiced by the admission of the challenged photos.[5] We do not consider this claim.

---

[5] Iowa Rule of Evidence 5.403 provides that "[t]he court *may* exclude relevant evidence if its probative value is substantially outweighed by danger of . . . needlessly presenting cumulative evidence." (Emphasis added.) "[E]vidence is not inadmissible merely because it is cumulative." *State v. Conner*, 314 N.W.2d

2. *Photo of sweatshirt with marijuana leaf.* Alderman challenges the admission of exhibit 177, a photograph of the black sweatshirt recovered from his mother's garage on September 24 with a picture of a marijuana leaf and the words "DON'T PANIC IT'S ORGANIC" on it. At trial, Alderman objected that the exhibit was "more prejudicial than probative."

Iowa Rule of Evidence 5.403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by danger of . . . unfair prejudice." "'Probative value' measures 'the strength and force of the evidence to make a consequential fact more or less probable.'" *State v. Martin*, 704 N.W.2d 665, 671 (Iowa 2005) (citation omitted). And "unfairly prejudicial evidence" is evidence that "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *Id.* at 672 (citation omitted).

Alderman maintains the photo of the sweatshirt with the marijuana leaf was only minimally probative, questioning whether the State proved a link between the sweatshirt and himself. Additionally, he claims the photo was highly prejudicial, as the State's theory of motive for Tumlinson's killing involved a planned robbery for the marijuana and cash Tumlinson had in his home in the early morning hours of September 22.

---

427, 429 (Iowa 1982). And even if the evidence should not have been admitted, "[n]ot all evidentiary errors require reversal of the trial court judgment." *Shawhan v. Polk Cty.*, 420 N.W.2d 808, 810 (Iowa 1988).

The sweatshirt was found in Alderman's mother's garage on September 24—two days after Alderman was taken into custody and only after Alderman's mother called and reported items she did not recognize in the garage. Alderman claims that someone other than him could have placed that clothing there. If the jury did not believe the sweatshirt in question—and, by extension, the other black clothing and BB gun found with it—was Alderman's, it has little probative value. But then any prejudice was also minimal. The sweatshirt with the marijuana leaf on it would only reflect negatively upon Alderman to the extent the jury believed it was his sweatshirt. *Cf. State v. Newell*, 710 N.W.2d 6, 28–29 (Iowa 2006) (deciding the probative value of an officer's testimony regarding "issues of power and control involved in domestic violence" was not substantially outweighed by its prejudicial effect because "[t]he expert's testimony would have an adverse effect on [the defendant's] defense *only* to the extent it had probative value," since the jury was never told the defendant perpetrated domestic violence on the victim and that determination was left up to the jury). The probative value is not substantially outweighed by danger of unfair prejudice.

Alternatively, even the photograph of the sweatshirt should not have been admitted, any error was harmless. The actual, physical sweatshirt was also introduced into evidence, without objection from Alderman. So the picture of the sweatshirt was merely cumulative. *See State v. Wilson*, 878 N.W.2d 203, 218–19 (Iowa 2016) (noting Iowa Rule of Evidence 5.103 only requires reversal for improperly admitted evidence when "the ruling affected 'a substantial right of the party'" and "[o]ne way to show erroneously admitted evidence did not impact a verdict is to show it was merely cumulative").

3. *Still photos from surveillance video.* Alderman challenges the admission of exhibits 156 and 122B. Exhibit 156 is a report created by Officer William Hurt, who worked in the forensics unit. His report includes still photographs taken from the surveillance video obtained from the home near Tumlinson's. When asked if he had "altered or enhanced" the photographs, Officer Hurt testified he "took a filter and did what we call a cookie cutter to highlight where the subject was in the video." Exhibit 122B is a still photograph from the surveillance video.

At trial, Alderman "object[ed] to foundation," which the court overruled. On appeal, Alderman describes the exhibits and then makes the conclusory assertion, "In view of the extensive modification made by the police prior to showing the video (and the stills from the video) to the jury, the district court erred in failing to sustain [his] objection." It is not clear what further foundation Alderman believes should have been laid. And Alderman cites no authority and offers no legal analysis for his conclusion his objection should have been sustained. We do not consider this claim further.

4. *Questions re: Alderman's DNA on bandana.* Alderman maintains that during the State's redirect examination of Officer Hurt, the State asked a "leading (and misleading) question [that] invite[d] the jury to come to a conclusion not supported by the evidence." He argues the court's decision overruling his objection to the question was an abuse of discretion. At trial, the following occurred:

> Q. Did you have any knowledge about that black-and-white bandana that had been collected— A. No, I did not.
> Q. —and found knotted like that (indicating)? A. I did not, no.
> Q. So you certainly did not have that information upon your review of what we see here of Suspect No. 3 in State's Exhibit 122B,

which actually looks like that bandana tied across their face; does it not?

ALDERMAN'S COUNSEL: Objection, leading.
PROSECUTOR: He was asked about it, Your Honor.
THE COURT: Overruled.
A. It appears to be a bandana tied across their face

Alderman claims the court should have sustained the objection that the prosecutor was leading the witness, but his argument on appeal is that the State's question was based on speculation regarding what exhibit 122B actually showed and disagreement with the State's description of the recovered bandana as black and white. Alderman's objection at trial was not that the prosecutor's question assumed facts not in evidence, made an improper characterization, or involved speculation. Moreover, Alderman cites no legal authority in support of nor offers any legal analysis of this issue. We do not consider it further.

5. *Questions on redirect of Wiseman.* Alderman also challenges the State's alleged improper use of leading questions with Wiseman on redirect examination. But, while Alderman has laid out the portions of the testimony he finds objectionable and explained his personal concerns, Alderman again fails to rely upon legal authority to support his contention the court erred.

6. *Jailhouse phone call and video.* Alderman challenges the admission of portions of exhibits 212 and 216, which are audio recordings from a jailhouse phone call and a jailhouse visit, as more prejudicial than probative. Alderman objected to the jury hearing statements he made on the audio recordings, including that he knew Dixon "from the joint," and a statement he made to his mother—not directly in reference to these charges—when he asked her, "Don't you know what a good liar I am?"

Both Alderman's counsel and the State offered arguments on their respective positions regarding the admission of the evidence, and then the court ruled on the objection. In our record, the court's ruling consists of nearly two pages of transcript. On appeal, Alderman takes one sentence from the court's ruling—"I don't have too much sympathy for anybody that says anything prejudicial over the jail phone because they know it's being recorded"—and argues that this remark "should be considered to have tainted the rest of the court's reasoning."

Alderman provides no argument regarding the prejudicial nature of the challenged statements nor does he discuss their probative value. He cites no case law for the proposition that a judge's statement can be found to taint their ruling on an evidentiary objection. In fact, his entire argument regarding this evidence consists of one paragraph in his appellate brief. We do not consider this further.

7. *Jury instruction.* Finally, Alderman maintains the court should have granted his request to have the verdict form given to the jury begin with, "We, the jury, find the defendant not guilty," rather than beginning with "guilty" alternatives. While Alderman has grouped this with his complaints regarding the court's various "evidentiary rulings," it is not clear to us that this belongs with the others. *See* Iowa R. App. P. 6.903(2)(g)(2) (providing that appellant's briefs "shall be structured so that each issued raised on appeal is addressed in a separately numbered division" with its own "statement addressing the scope and standard of review"). Additionally, though Alderman takes issue with the court's reasoning for denying his request, he provides no authority to support his contention that the court abused its discretion in doing so. When our supreme court was asked to consider this same issue, in another first-degree murder case, the court found no abuse of

discretion when the court denied the defendant's request to place the "not guilty" option before the "guilty" option. *See State v. Piper*, 663 N.W.2d 894, 915 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 550–51 (Iowa 2010). Alderman has done nothing to distinguish his case from *Piper*. We cannot say the court abused its discretion in denying his request about the form of the instruction.

**C. Sufficiency of the Evidence.** Alderman challenges the sufficiency of the evidence to support each of his convictions, generally arguing there is not substantial evidence to prove his involvement in the murder and robbery. "We review challenges to the sufficiency of the evidence supporting a guilty verdict for correction of errors at law." *State v. Webb*, 648 N.W.2d 72, 75 (Iowa 2002). "We review the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the evidence in the record." *Id.* at 76.

First, Alderman argues there is insufficient evidence because no physical evidence from the scene points to his involvement. We acknowledge the lack of physical evidence. While officers recovered dark clothes and a BB gun in the garage of Alderman's mother, and notwithstanding the question of when the items were placed in the garage or by whom, those specific items were not directly linked to the crime scene. The image of five people running near Tumlinson's home at 12:39 a.m. showed individuals dressed generally in dark clothing, but it is not clear the clothing items found in the garage were worn by any of those individuals. No blood was found on the recovered clothing items.

That being said, physical evidence is not the only way to place Alderman at the scene. And, in fact, based on the elements of the crimes of which he was convicted, Alderman's presence at the scene was not necessary for him to be found guilty. Alderman was tried under the theory of aiding and abetting in a felony murder. "A person is guilty of aiding and abetting if he or she 'knowingly approve[s] and agree[s] to the commission of a crime, either by active participation in it *or by knowingly advising or encouraging the act in some way before* or when it is committed.'" *State v. Allen*, 633 N.W.2d 752, 754 (Iowa 2001) (alterations in original) (emphasis added) (citation omitted). Here, to convict Alderman of murder in the first degree, the State had to prove:

> 1. On or about September 22, 2017, [Alderman], or someone he aided and abetted, shot Brady Tumlinson.
> 2. Brady Tumlinson died as a result of being shot.
> 3. [Alderman], or someone he aided and abetted, acted with malice aforethought.
> 4. [Alderman], or someone he aided and abetted, was participating in the offense of Robbery.

For the jury to properly convict Alderman of robbery in the first degree, the State was required to prove:

> 1. On or about the 22nd day of September, 2017, [Alderman], or someone he aided and abetted, had the specific intent to commit a theft.
> 2. To carry out his intention or to assist him in escaping from the scene, with or without the stolen property, [Alderman], or someone he aided and abetted:
> a. committed an assault on Brady Tumlinson and/or Jacey Grubbs; or
> b. Threatened Brady Tumlinson and/or Jacey Grubbs with, or purposely put Brady Tumlinson and/or Jacey Grubbs in fear of immediate serious injury; or
> c. Threatened to immediately commit a forcible felony.
> 3. [Alderman], or someone he aided and abetted, was armed with a dangerous weapon.

And finally, for Alderman to be convicted of conspiracy to commit burglary in the first degree, the State had to prove:

> 1. On or about the 22nd day of September 2017, [Alderman and Culbreath] agreed with each other, or Nakita Wiseman, or Christopher Dixon, or Darrell Williams, that one or more of them would:
> a. commit Burglary First Degree, or
> b. attempt to commit the Burglary First Degree
> 2. [Alderman] entered into the agreement with the intent to promote or facilitate the Burglary First Degree.
> 3. Tristin Alderman, or Dmarithe Culbreath, or Nakita Wiseman, or Christopher Dixon, or Darrell Williams committed an overt act.
> 4. Tristin Alderman, and Dmarithe Culbreath, and Nakita Wiseman, and Christopher Dixon, and Darrell Williams were not law enforcement agents investigating the burglary or assisting law enforcement agents in the investigation when the conspiracy began.

Next, Alderman points out inconsistencies in the testimony of Wiseman and Culbreath about the events in question. He asks us to conclude that their inconsistencies make the two witnesses' testimony without value. The two men's descriptions of the early morning happenings are not perfectly consistent. But both testified as to Alderman's planning and participation. Wiseman testified that Alderman reached out to him and then told him about the robbery they were going to commit. From there, Alderman reached out to Dixon and set up a meeting at the local grocery store parking lot before showing Dixon the location of Tumlinson's home. Dixon then lined up others to participate before returning to pick up Alderman and Wiseman. According to Culbreath, it was Alderman who handed out gloves for them to wear. Wiseman was aware two of the men had guns with them and testified Alderman had a BB gun, with the tip painted black so it looked like a "real" gun, with him. As they approached the house, Alderman pointed out what room was Tumlinson's and claimed he had been "fucked out of some money."

Finally, Alderman maintains the data, records, and content from his cell phone do not prove he was involved in the murder and robbery. The killing and robbery of Tumlinson are not explicitly discussed in the content of Alderman's phone. And the location data, which could support that Alderman was at Tumlinson's home, could also support that Alderman remained at his own home during that time period. But we do not consider the evidence concerning Alderman's phone in isolation. When asked who he talked to on September 21 into the early morning hours of September 22, Alderman failed to tell police he spoke to either Wiseman or Dixon. But the content downloaded from his phone shows a number of contacts with both of them, and those contacts largely corroborate Wiseman's testimony.

Wiseman and Alderman were in contact a number of times on the afternoon and early evening of September 21. Additionally, Wiseman testified he could not remember what vehicle Alderman picked him up in that day but knew it was not his truck. At 6:50 p.m. that evening, a text message was sent from Alderman's phone, stating, "Mom I need to use the car for 2 seconds." Wiseman testified that after Alderman picked him up, they talked about the robbery and Alderman walked him past Tumlinson's home. Later, they met up with Dixon in the grocery store parking lot. Alderman's phone shows a text to "CD"—which testimony established was a nickname of Dixon—at 10:16 p.m. stating "Rockingham hyvee." More back and forth occurred between Alderman and CD. Then, at 11:23 p.m., Alderman sent CD, "Don't be talking about numbers when we in the car it's between me and u that's [sic] knows." At 12:24 p.m., Alderman sent CD a message that said, "U just passed it." Within one minute, CD called Alderman; that phone call lasted

forty-one seconds. We can infer Dixon drove past where he was supposed to pick up Alderman and Wiseman, as the testimony from both Wiseman and Culbreath was that Alderman and Wiseman rode with Dixon to where he parked his car near Tumlinson's home. Dixon's car was the lead car, as he and Alderman were the ones who knew the location of Tumlinson's home. Additionally, another surveillance recording near Tumlinson's home showed two sets of headlights, with the vehicles in close proximity to each other, driving past at 12:28 a.m. It was about eleven minutes later, at 12:39 a.m., that the neighbor's surveillance camera recorded five individuals running past—apparently fleeing from Tumlinson's home. Then, at 12:44 a.m., Alderman's phone was powered back on.[6] Almost as soon as it was turned back on, Alderman's phone made several calls to the Wiseman's "sister"—the woman he said he had pick him up. One of the calls lasted more than thirteen minutes, which tracks with Wiseman's testimony that the woman did not know how to find Alderman's home and needed detailed directions.

Between the testimony of Wiseman and Culbreath, which was corroborated by the data, content, and records for Alderman's cell phone, Alderman's involvement in the robbery and murder of Tumlinson is supported by substantial evidence in the record.

**D. Sentencing.**

1. *Consecutive Sentences.* Alderman was sentenced to the mandatory sentence of lifetime imprisonment without the chance of parole for his first-degree-

---

[6] The records do not show when Alderman's phone was powered down or what caused it—whether someone purposefully turned it off or it lost power due to lack of charge.

murder conviction and a twenty-five year term of incarceration for robbery in the first degree. The district court ordered him to serve the two sentences consecutively.

Alderman maintains the court did not have the discretion to sentence him to consecutive terms of incarceration because the "[t]here were not separate and distinct offenses, just one robbery that resulted in the death of one individual and injuries to two others." We disagree. Iowa Code section 901.8 provides, "If a person is sentenced for two or more separate offenses, the sentencing judge may order the second or further sentence to begin at the expiration of the first or succeeding sentence." And our supreme court has recognized that when the accused

> is convicted on several counts of an indictment, and each count is for a separate and distinct offense, a separate sentence may be pronounced on each count, and the court may pronounce separate and distinct sentences which are cumulative, and are to run consecutively. *This is true, even though the several offenses were committed in the course of a single transaction.*

*Stradt v. State*, 608 N.W.2d 28, 29–30 (Iowa 2000) (emphasis added) (citation omitted).

Alternatively, Alderman maintains the court abused its discretion in imposing consecutive sentences because the court relied on improper factors in doing so. During sentencing, the court stated:

> [T]he facts demonstrate that this all took place because of Mr. Alderman, that he was the driving force, the person that set it up, the person that thought he could get away with it. And then, like the gumption of throwing your co-defendant under the bus, telling the cops you walked by some bloody gloves, I'm like, wow, you know? Not only that, when you found out the cops were there, you tried to throw all the blame on somebody else. That's incredible to me. So the amount of complete sociopath, narcissistic thinking you had only

for yourself and no thoughts for what other people may be feeling or suffering or needing or anything.

Alderman argues it was impermissible for the court to consider that Alderman tried to cover up the crime and blame his codefendants. He also takes issue with the fact that the court believed the crime was especially heinous due to Alderman's close personal relationship with Tumlinson. He maintains the court made improper mental health diagnoses, which were not supported by the record. Finally, he claims the court's statements, taken as a whole, "show[] a high degree of personal animus" toward him.

We recognize the charged nature of the court's statements, but we cannot say the court relied on improper factors. The court's understanding that Alderman tried to deflect blame and escape detection were formed from the evidence presented at trial. Similarly, Alderman is the one who repeatedly told officers Tumlinson was like a brother to him. At sentencing, the court may properly consider a defendant's lack of remorse and the danger the defendant poses to society. *See State v Knight*, 701 N.W.2d 83, 87 (Iowa 2005) (providing the sentencing court is not precluded "from finding a lack of remorse based on facts other than the defendant's failure to plead guilty" and such a consideration is proper at sentencing); *cf.* Iowa Code § 901.5 (requiring the court to impose sentence "for the protection of the community").

We agree the court does not have the expertise to make medical or mental health diagnosis, and no evidence was presented at trial or sentencing to support such a finding here. But we assume that the court used the terms "sociopath" and

"narcissistic" generally and not in their technical or medical form. And we cannot say the court's use of them shows reliance on an improper factor.

2. *Restitution.* As part of its sentencing order, the court ordered Alderman to pay restitution for attorney fees and court costs. The sentencing order stated, in part:

> The defendant is ordered to pay court costs and other costs of this action, including restitution for correctional fees, if any, and all other applicable surcharges and fees.
> . . . .
> The defendant must pay restitution for attorney fees pursuant to Section 815.9 for any costs incurred, and judgment is entered for the same. Pursuant to Iowa Code Section 815.9(5), the Court, upon inquiry and review, concludes the defendant is reasonably able to pay attorney fees as reimbursement to the State.

Pursuant to Iowa Code section 910.2, the court can only order a defendant to pay restitution on "category two" items to the extent the defendant has the reasonable ability to pay. *See* Iowa Code § 910.2(1); *State v Albright*, 925 N.W.2d 144, 159 (Iowa 2019). Attorney fees and court costs are category two items. *See* Iowa Code § 910.2(1)(3), (4). And here, while the court made a general statement that Alderman had the ability to pay, the court did not conduct a hearing on the matter or have the full amounts of restitution before it at the time the court made the statement. As we must vacate the portions of the sentencing order outlined above, we note the sentencing court did not have the benefit of *Albright* at the time it entered the order.

We vacate the portions of the sentencing order requiring Alderman to pay court costs and attorney fees and remand for determination of Alderman's reasonable ability to pay. *See State v. Kurtz*, 878 N.W.2d 469, 472 (Iowa Ct. App. 2016).

**III. Conclusion.**

We affirm Alderman's convictions. We vacate the portions of the sentencing order requiring Alderman to pay court costs and attorney fees and remand for determination of Alderman's reasonable ability to pay, but we otherwise affirm Alderman's sentences.

**CONVICTIONS AFFIRMED; SENTENCE VACATED IN PART AND REMANDED.**