**IN THE COURT OF APPEALS OF IOWA**

No. 23-1723
Filed December 4, 2024

**IN THE INTEREST OF E.R.,**
**Minor Child,**

**E.R., Minor Child,**
    Appellant.
_____

    Appeal from the Iowa District Court for Scott County, Michael Motto, Judge.


    A juvenile appeals the juvenile court's ruling that he committed the delinquent act of sexual abuse in the second degree in violation of Iowa Code section 709.3 (2024). **AFFIRMED.**


    Tiffany Kragnes, Des Moines, for appellant.

    Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee State.


    Considered by Tabor, C.J., and Chicchelly and Sandy, JJ.

**SANDY, Judge.**

Occam's razor provides, "when confronted with different explanations for an occurrence, the simplest is the most likely explanation." *Madison St. Props., LLC v. Marcus Corp.*, No. 20CV50471, 2023 WL 5860318, at *3 (N.D. Ill. Sept. 11, 2023). Although not outcome determinative, we believe this principle applies in this case.

E.R. was accused of sexually abusing his younger cousin one night as the two were playing video games. The State filed a delinquency petition alleging E.R. committed the delinquent act of sexual abuse in the second degree in violation of Iowa Code section 709.3 (2024). Armed with a witness credibility argument, E.R. contends the evidence was insufficient to establish that he committed a "sex act" as defined by Iowa Code section 702.17. Thus, he claims the evidence is not enough to establish that he committed the delinquent act of sexual abuse in the second degree.

Upon our de novo review, we affirm the juvenile court court's decision.

I.      **Background Facts and Proceeding Facts**

Thirteen-year-old E.R. has had a difficult childhood. He and his three siblings have been raised by parents who have consistently struggled with managing their issues with substance abuse. In the spring of 2022, E.R.'s aunt, W.F., unexpectedly dropped by E.R. and his parents' house. Upon her entry into the home, W.F. noticed E.R.'s mother—who is W.F.'s older sister—was "under the influence of some sort of drug." W.F. also observed that E.R.'s mother was alarmingly thin. W.F. asked E.R.'s mother what was going on, and she disclosed she was using meth. W.F. offered to take E.R.'s mother to a rehabilitation center,

but she refused. Still, she did ask W.F. to take E.R. into her home over the summer. W.F. agreed to do so.

At the end of the summer, W.F. tried to return E.R. to his parents' house. But when she arrived at the house, E.R.'s mother told W.F. she was in no position to care for E.R. In W.F.'s words, "I took him back and [his mother] wasn't even happy to see [E.R.] at that point and was basically, like, I'm not ready for you to be back." Additionally, while she was in the house, W.F. saw "pills everywhere." After seeing pills in the house, W.F. made the decision to report E.R.'s parents to the Department of Health and Human Services (HHS). An HHS worker investigated the report and found "substances or a pipe of some sort" in the yard of the home. E.R. and his siblings were then removed from the home.

Upon their removal from their parents' home, E.R. and his three siblings were initially placed in the care of another aunt, T.F., in Burlington.[1] At the time, the T.F. lived with the children's grandmother. This was ultimately found to be an untenable placement for all the children based on space constraints in the grandmother's home. A few months later, W.F. asked HHS if E.R. and his little sister could be placed with her. This request was granted by HHS. E.R.'s other two siblings continued their placement with T.F.

Tension soon developed between W.F. and HHS after E.R. and his little sister were placed with W.F. According to the HHS worker who oversaw the removal and placement of the children—W.F. frequently complained to HHS about "financial issues; wanting to be reimbursed at a quicker rate than what the State

---

[1] W.F., T.F., and E.R.'s mother are sisters.

reimburses at." W.F. also expressed many times her dissatisfaction with how "[HHS] was dictating how the case was managed." Particularly, W.F. was upset that she did not have more discretion in parenting E.R. and his younger sister while they were in her care. The record discloses W.F. sent several text messages to HHS workers requesting that E.R. and his little sister be removed from her care.

W.F. readily admitted she was frustrated with HHS. Even so, she denied her frustrations with HHS primarily stemmed from reimbursement issues. Instead, she claimed her main issue with HHS was a lack of communication and consistently being "overruled" in her parenting decisions related to E.R. and his younger sister. W.F. claimed these frustrations led her to request that E.R. and his little sister be removed from her care. At E.R.'s adjudication hearing, W.F. testified she "loved having [E.R.] in my home. I was just trying my best in everything I could for both [E.R.] and my sister."

W.F. also expressed annoyance with HHS's handling of sibling visits. According to W.F., she and T.F. were primarily responsible for providing transportation to sibling visits. This occurred even though HHS told W.F. it would provide transportation for these visits. The sibling visits became problematic for W.F. because some occurred in Burlington. W.F. lives in Davenport, which is located nearly one hundred miles apart from Burlington. After one particularly bad visit between E.R. and his siblings, W.F. sent the following text message to the HHS worker and T.F. in a group chat:

> We need to either set up a conference call or something because what happened today was UNACCEPTABLE and put me in a very comprising position!! I will not comply with anything further until we come up with a bigger game plan than what we have. Because I'm done going to visitations. I'm not going to do the phone calls.

> Because of the threats and remarks I'm DONE. Either we come up
> with a plan or I'm DONE. I will wash my hands [of] it all.

As W.F. was experiencing difficulties with HHS, E.R.'s behavior in her home took a dark turn. When W.F. first took E.R. into her home during the summer of 2022, he stayed in a basement room belonging to her stepson. But after E.R. and his younger sister were placed with W.F. by HHS, she and her husband let E.R. share a room with their then-six-year-old son—K.F. W.F. and her husband even bought a bunk bed to make it easier for K.F. and E.R. to share a room.

On the night of December 4, 2022, W.F. was walking down a hallway in her home when she heard the sound of a T.V. blaring from K.F. and E.R.'s room. This bothered W.F. because this was a school night, and the children were supposed to be asleep. W.F. then checked on K.F. and E.R. As she opened the door to K.F. and E.R.'s room, she heard "a sound coming from like if you hop down from the top bunk, there was like, a creak sound." W.F. saw E.R. lying on the bottom bunk, while K.F. was on the top bunk holding a controller and playing Fortnite. W.F. took the controller from K.F. and turned the T.V. off. But as she did so, she noticed "a look of fear" on K.F.'s face. W.F. thought nothing of this because she attributed the look on her son's face to the fact that E.R. and K.F. "just got caught playing video games at 9:30 at night on school night."

As the children in the home were eating breakfast and preparing for school the next morning, K.F. approached W.F. and told her E.R. had put inappropriate images on the T.V. the night before. K.F. disclosed E.R. showed him images of "[b]oobies and pee-pees" on the T.V. After K.F. told W.F. this, she ushered the other children out of the room so that she could speak to K.F. alone. When they

were alone, K.F. told W.F. that E.R. "stuck his finger up my butt and he licked my pee-pee." K.F. also indicated to his mother that his buttocks were in pain.

Immediately after K.F. told her E.R. had sexually abused him the night before, W.F. attempted to contact E.R.'s attorney and HHS. She never received a response from either. She then contacted an HHS hotline. An HHS hotline worker told her HHS would call the police. But after a few hours passed with no police officers arriving at the home, W.F. called the police herself. The police arrived soon after and arrested E.R. and removed him from the home.

After E.R. was taken into custody by the police, W.F. took K.F. to a local hospital in Davenport to receive a forensic sexual assault exam. A registered nurse performed a sexual assault examination on K.F. K.F. told the nurse prior to the examination that the night before "[E.R.] and me were watching T.V. in our room, and he put on a show with boobies, penises, and other girl parts. It was yucky. He started to lick my pee-pee and put his fingers in my butt." The nurse testified at E.R.'s adjudication hearing that she examined K.F.'s rectum but saw no signs of "trauma or injury." But she explained it is not uncommon for sexual abuse victims not to exhibit signs of trauma or physical injury. And she stated she believed K.F. had been sexually abused.

The State filed a delinquency petition on December 6, 2022. The State alleged E.R. committed the delinquent act of sexual abuse in the second degree in violation of Iowa Code section 709.3. An adjudication hearing was held May 24, 2023. At the hearing, the juvenile court heard testimony from K.F., W.F., the nurse, and T.F. A disposition hearing was later held in October 2023. The juvenile court issued its dispositional order after that. The juvenile court found E.R. committed

the delinquent act of sexual abuse in the second degree in violation of Iowa Code section 709.3 and placed him on probation with the juvenile court services. The juvenile court withheld a decision on whether E.R. would be required to register as a sex offender.

E.R. now appeals.

## II.     Standard of Review

"Juvenile delinquency proceedings are 'special proceedings that provide an alternative to the criminal prosecution of children where the best interest of the child is the objective.'"  *In re T.H.*, 913 N.W.2d 578, 582 (Iowa 2018) (citation omitted).  Our review for a challenge to the sufficiency of the evidence in a juvenile delinquency adjudication is de novo.  *Id.*  "We presume the child to be innocent of the charges, and the court cannot find that the child engaged in the delinquent conduct unless the State can prove beyond a reasonable doubt that the child engaged in such behavior."  *In re J.A.L.*, 694 N.W.2d 748, 751 (Iowa 2005).  We give weight to the factual findings of the juvenile court, especially those involving witness credibility, but are not bound by them.  *In re A.K.*, 825 N.W.2d 46, 49 (Iowa 2013).

## III.    Analysis

For sexual abuse in the second degree, the State was required to prove E.R. committed a "sex act" with a child.  Iowa Code §§ 709.1(3), .3(b).  Iowa Code section 702.17 defines "sex act" as follows:

> The term *"sex act"* or *"sexual activity"* means any sexual contact between two or more persons by any of the following:
>             1. Penetration of the penis into the vagina or anus.

2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.

3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 151, or 152.

4. Ejaculation onto the person of another.

5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.

6. The touching or a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

On appeal, E.R. does not contest the fact that K.F. was a child when the abuse occurred. Instead, he contends the evidence is insufficient to establish that he committed a sex act. Thus, he contends the evidence was insufficient to establish that he committed sexual abuse in the second degree. Essentially, E.R.'s entire appeal boils down to a witness credibility argument. He contends the evidence is clear W.F. wanted him out of her house, and that her desire to have him removed from her home motivated her to fabricate allegations against him. As E.R. puts it, "[W.F.] is not a credible witness and she pushed K.F. to repeat the scant allegations" against him. He adds, "because [W.F.] was at the heart of the allegations against [him] providing an excuse to get him out of the house, K.F. is not credible either." In support of his argument, E.R. points to several text messages in the record which show W.F. requested E.R. and his little sister be removed from her care. We reject this argument for two reasons.

First, we begin by noting the juvenile court heard testimony from K.F. that E.R. "[s]tuck his finger up my butt and he licked my pee-pee." These acts meet the definitions of a "sex act" provided for in the Iowa Code. *See id.* And a victim's testimony alone is enough to sustain a finding of guilt for sexual abuse. *See State*

*v. Trane*, 934 N.W.2d 447 (Iowa 2019) ("Here, the jury heard K.S. testify that Trane repeatedly and forcibly inserted his finger in her vagina and repeatedly grabbed her hand and put it over his groin area. K.S.'s testimony, standing alone, is sufficient to support Trane's conviction on this count."); *see also State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) ("We find that the alleged victim's testimony is by itself sufficient to constitute substantial evidence of defendant's guilt."); *In re Z.N.*, No. 16-0693, 2017 WL 1086229, at *3 (Iowa Ct. App. Mar. 22, 2017) ("The witness's consistent testimony at trial regarding the operative fact that Z.N. molested her is sufficient to carry the State's burden.").[2]

Second, although E.R. attacks the credibility of W.F. and K.F. due to his belief W.F. had a motivation to fabricate allegations of sexual abuse, the juvenile court explicitly found W.F. and K.F.'s testimony to be credible. In its ruling following the adjudication hearing, the juvenile court wrote:

> To be fair, there is plenty of evidence that W.F. was frustrated with the Department, and the Court found [the HHS worker] and T.F. to be credible in consistently recounting the conflicts. W.F. never denied the conflicts. That said, the Court found the testimony of [K.F.], W.F., and the nurse to be credible in recounting the sexual abuse, and [the HHS worker] and T.F. did not, and could not, simply claim the abuse did not happen.

The juvenile court also explicitly rejected E.R.'s theory that W.F.'s alleged motivation to have him removed from her home made her an uncredible witness. It wrote:

---

[2] In his brief, E.R. also notes the fact that "K.F. did go to the hospital for an exam and there was no sign of anal trauma, redness or injury." But our supreme court has said a sexual abuse victim's accusations need not be corroborated by physical evidence. *See Hildreth*, 582 N.W.2d at 170 ("This court has held that a [sexual abuse] victim's accusation need not be corroborated by physical evidence.").

> The first issue the Court has with this theory, other than the fact that it is speculative in nature, is that W.F.'s main issue is not the removal of [E.R.] from her home. [E.R.] was there voluntarily the prior summer, and was there by request this time around, too. W.F.'s complaint was that the Department was preventing W.F. from raising the five kids in her care the way she wanted to raise them (the Department was micromanaging her care, so to speak), and that the Department was not getting her reimbursed for the travel costs and other expenditures related to caring for [E.R.] and [his sister]. That is, she does not dislike [E.R.]. There is no motive for her to make up serious allegations against him personally.

These findings are significant because appellate courts are to defer to witness credibility determinations made by the juvenile court. *See In re Marriage of Gast*, No. 23-0109, 2024 WL 260823, at *3 (Iowa Ct. App. Jan. 24, 2024) ("But we defer to the district court's factual findings based on witnesses' credibility because of that court's inherent advantages in making credibility determinations."). We give that deference to the juvenile court because it is in a much better position than we are to assess the credibility of a witness. *See Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) ("It is pragmatic because the district court has a front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript."). From this record, we see no reason to disturb the credibility determinations made by the juvenile court.

Accordingly, we find substantial evidence supports the juvenile court's ruling that E.R. committed the delinquent act of sexual abuse in the second degree.

## IV. Conclusion

We affirm the juvenile court's ruling, finding substantial evidence supports the finding E.R. committed the delinquent act of sexual abuse in the second degree.

**AFFIRMED.**